W. A. LESSENGER, Appellant, v. CITY OF HARLAN et al., Appellees.

**MUNICIPAL CORPORATIONS:** Public Improvements—Damnum
1  Absque Injuria. Damages resulting from the non-negligent grading, paving, and guttering, by a municipality, of its public streets is *damnum absque injuria.* So held where damages resulted from accelerated drainage.

**WATERS AND WATERCOURSES:** Surface Waters—Drainage by
2  Means of Paving, Sewers, Etc. A municipality, by grading, paving, guttering, and sewering its public streets in the general course of natural drainage, may, without liability to the owner of a servient estate, carry *surface waters* to, and deposit them at, practically the same point to which nature would carry and deposit them, even though the flow is accelerated and the volume of water is increased by the consequent interference with evaporation and seepage.

*Appeal from Shelby District Court.*—THOMAS ARTHUR, Judge.

SEPTEMBER 17, 1918.

ACTION to enjoin the defendants from discharging surface water upon plaintiff's land, and for damages. Decree dismissing plaintiff's petition. Plaintiff appeals.—*Affirmed.*

*Byers, Byers & Miller,* for appellant.

*E. S. White,* City Attorney, *Cullison & Cullison,* and *Thomas Smith,* for appellees.

GAYNOR, J.—This action was brought in equity to secure an injunction restraining the defendants, particularly the city of Harlan, from discharging surface water from its storm sewer upon the lands of the plaintiff. Damages are also asked.

1. MUNICIPAL CORPORATIONS: public improvements: *damnum absque injuria.*

It appears that all the territory involved in this suit is within the corporate limits of the city. A map of the platted portion of the city, showing the streets and alleys, is herewith submitted; and it shows that, immediately east of and adjacent to the platted portion, somewhat in the platted portion, are the tracks of the Chicago Great Western Railway Company and the Chicago, Rock Island & Pacific Railway Company, and the Chicago & Northwestern Railway Company. Immediately east of these tracks lies plaintiff's land, consisting of 115 acres of unplatted agricultural land. The platted portion of the city is much higher than the land to the east, and much higher than the land owned by the plaintiff. The natural course of drainage from the platted portion of the city is towards the east, and towards the plaintiff's land.

PLAT
SHOWING OVERFLOWED LAND
PORTION OF EAST ONE HALF OF SEC. 18, 77, 38
AND
TRIBUTARY DRAINAGE AREA
HARLAN, IOWA.

Plaintiff complains and says that the defendant city paved its streets, and under a portion of the pavement has constructed and now maintains a storm sewer, which receives, carries, and discharges the surface water, which falls or flows upon the pavement, onto plaintiff's land; that by this means the city artificially drains a large portion of its entire surface onto plaintiff's property; that within said territory all the rainfall and melting snow and all waters cast thereon by the street sprinklers and from the flushing of its hydrants are carried into this sewer, and through it onto plaintiff's property; that this sewer has its outlet at or near Fifth and Victoria Streets, at which point it empties its waters rapidly and in large quantities upon the property and right of way of the Chicago Great Western Railway Company, whence it passes promiscuously across

the right of way of the Chicago, Rock Island & Pacific Railway Company and across the right of way of the Chicago & Northwestern Railway Company upon plaintiff's land; that the outlet of said storm sewer is neither at, in, nor near a natural watercourse through which such water might be carried away; that, if said pavement and said storm sewer were not maintained, the water which falls or comes upon said city's territory would evaporate or seep into the ground and disappear, and only a small portion of the same would find its way to the land of plaintiff; that some would drain into natural watercourses in the north and south part of the city, and would not find its way to plaintiff's land; that a large portion of the city's territory is not naturally drained by the swale through which said storm sewer has its outlet; that, under the conditions complained of, all the water that falls and all that comes upon the streets finds its way over the pavement into said sewer, and through it onto plaintiff's land.

It was stipulated upon the trial that, under and by virtue of proper enactments and ordinances, and by resolutions properly passed, defendant city duly and legally fixed and established the permanent grade of its several streets, including the streets involved in this controversy, and that the grades so established were in accordance with the plan and recommendations of a competent and capable engineer, and all done after a proper examination and survey by said engineer of the streets and property abutting thereon and adjacent thereto; that, after the grades of the streets had been planned and surveyed and established, the city adopted and fixed the permanent grades of its streets, including all streets in controversy, and subsequently, by and through its council and mayor, under the necessary and required acts, resolutions, ordinances, and proceedings required by law, caused said streets, including the streets involved in this controversy, to be brought to permanent

grades, and proceeded properly and lawfully, by ordinance
and resolution, to pave, curb, and gutter the same and to
provide proper drainage therefor; that the bringing of said
streets to grade and the paving thereof and the providing
of curbs and gutters therefor, as well as the construction
and establishment of the storm sewer and sewers herein in-
volved, wherever constructed, and especially at the place
complained of by plaintiff, as well as the provisions for the
drainage of said streets, were all done and provided under
the direction and in accordance with the plans, specifica-
tions, and survey of an efficient and competent civil en-
gineer, employed by the city for that purpose, in the doing
of which things the city was in no way careless or negli-
gent; that, in the establishment of the grades and in doing
the work in bringing said streets to grade, and in the mak-
ing of said improvements thereon and therein, all the pro-
ceedings, resolutions, and ordinances were duly passed,
adopted, enacted, and complied with as by law provided,
and all notices required by law in the making of said im-
provements and in the establishment of said grades were
duly and legally given.

A city is authorized, under our statute, to bring its
streets to grade. This involves the idea of lowering or
raising them above the natural level of the ground at points
where the necessities of travel demand a lowering or rais-
ing. It has the power to open, grade, and improve its
streets, and this involves grading, paving, and guttering.
In determining the necessity for these, it acts in a legisla-
tive capacity, and is not answerable for error of judgment
in this respect. In the very nature of things, the changing
of agricultural or rural lands into city territory necessi-
tates some disturbance of the surface of the ground, and
out of this inevitably grows a disturbance of the surface
drainage of the ground. Where, in the exercise of the
rights given it by statute, it follows the requirements of

the statute, it is not liable for consequences that follow the doing of the act, without some showing, at least, of negligence in the manner of the doing. It is not liable for results that follow the discharge of its public duties without negligence.

Where a city has authority, under the statute, to do a particular thing, through its properly constituted officers, it cannot be held liable to a citizen for consequences that follow the doing, in the absence of some showing of negligence in the manner of the doing. A natural person has the right to a proper and profitable use of his own land; and if, in the exercise of such right, without fault or negligence, loss unavoidably occurs to his neighbor, the neighbor is without remedy. Cities and towns, as such, certainly are invested with as much immunity in the exercise of rights over their property as individuals. If, in the doing of these things, which it has the right to do under the law, for the public good and for the proper and profitable use of its own territory, it causes, without negligence, injury to a citizen, the citizen is without remedy. If we should hold the city liable to individuals for consequential damages resulting solely from the improvement of the city in the grading, guttering, and paving of its streets, done properly and in strict accordance with the requirements of the statute, upon a simple showing that injury occurred from the doing, without any showing of negligence in the manner of the doing, we would be going a long way in preventing any improvement. If we should hold that the city is liable to a citizen for consequential damages, upon the simple showing that the city, in the lawful exercise of its right, without negligence in the manner of the doing, graded its streets and paved and guttered them, and, as an incident thereto and a consequence thereof, the surface water was diverted from the course it pursued in the state of nature, we would throw in the way of public improvement insur-

mountable stumbling blocks. This would be especially true where it is not shown that the city, by the exercise of reasonable care and thoughtfulness for the safety of the citizen, could have done the work complained of in any other manner. The act of the city in determining the necessity for the work is legislative. The doing of the work and the manner of the doing may be ministerial. Where there is no fault in the doing or in the manner of the doing, it cannot be held liable for consequential damages flowing from the exercise of the right to do.

So much for the general proposition. '

Concretely, however, we are met by the proposition that a citizen has no right to divert water from the course of its natural drainage and cast it upon the land of his neighbor in greater quantities or in any other manner than it would go in the course of nature. The citizen may tile his land into a natural channel on his land, even though doing this may facilitate the flow of surface water into the natural channel. He may lay tile in a natural channel or watercourse on his own land, even though the effect of it is to facilitate the flow of water along the channel. He may tile his land into a natural channel or watercourse, even though it increases the volume of water that flows into the natural channel or watercourse. In doing so, he does no wrong for which he is answerable, provided the waters brought into said channel and discharged are ultimately released at the same place at which they would have been discharged in the course of nature. We are speaking now of surface water; and the fact that evaporation and seepage are interfered with does not change the situation. Of course, a citizen cannot dig a ditch and divert the water from its natural course, and then tile into that ditch and discharge the waters upon his neighbor; but, if there is a natural watercourse, or a course through which

2. WATER AND WATERCOURSES: surface waters: drainage by means of paving, sewers, etc.

the water naturally flows from the surrounding country
in a state of nature, he may tile his land into it, and of this
his lower neighbor cannot complain.

It is claimed, however, that the defendant placed a storm
sewer in Victoria Street, into which were gathered the wa-
ters coming from the other streets; and through this sewer
the water from the city was carried in a body, and dis-
charged at a point near the northwest corner of plaintiff's
land. Now, if this water, gathered into this sewer, did not
naturally gather there, or its course was changed, and it
was forced there by the change, and the sewer was placed
to receive it and carry it in a body onto plaintiff's land,
there would be force in plaintiff's contention. The record,
however, discloses that the street in which this storm sewer
was laid, and streets leading into it, were natural outlets
for the surface water before the storm sewer was laid; that
practically the whole surface water of the city tends to-
wards this point; that the surface water of the city, in
the course of nature, unaffected by any act on the part of
the city, had a natural outlet at this point; that deep gullies
had been washed in these streets, and that these gullies re-
ceived and carried water from the city to the west, and dis-
charged it practically at the point where this sewer dis-
charges. This sewer was laid in the gullies, and received
the same water, practically, that was received by these gul-
lies, and discharged it practically at the same place, with
practically the same consequential injury to plaintiff's
land. The city has not changed the natural course of drain-
age, but has availed itself of natural conditions that ex-
isted there, which, before the putting in of the sewer,
served the same purpose that the sewer serves. It cannot
be said that the city gathered the waters from this terri-
tory into this channel and discharged them upon the plain-
tiff. The waters naturally came there,—came there in the
course of nature,—facilitated, perhaps, somewhat by the

paving in reaching there; but practically the same waters came to this street and passed through the gullies to the same point at which this sewer pipe was laid.

It is shown in the instant case that, in grading, paving, and guttering the streets of the defendant city, very little, if any, disturbance was made in the general surface of the ground as it existed before the work was begun. Any change in the course that the surface water may have pursued before the improvement is, at best, but slight, and follows only as an incident to the exercise of the right to grade, pave, and gutter its streets. No obstructions have been placed in the way of the natural flow of water; no barriers have been erected; no cuts have been made or ditches dug to divert the water from its natural channels. Any disturbance in the course of the surface water as it existed before the work was done by the city, cannot be traced to any specific act done by the city to that end. Whatever change in the natural course of water upon the surface of the ground within the city's territory that may have taken place, is the natural and inevitable result of the exercise of that right and dominion over the property within its limits given to it by statute. No wrong can be predicated upon a showing that the city has exercised its statutory right in improving the territory within its own limits in the manner here shown. In the absence of any showing of any positive act of malfeasance or misfeasance, or of negligence in the doing of the act, the consequential damages resulting from the act must be borne by the sufferer without complaint.

It is a general principle that the owner of the dominant estate cannot concentrate at one point the surface water diffused over the surface of his own land and discharge it in a body upon the servient estate. This rule, however, prohibiting the concentration of surface water at a particular point, does not apply to natural depressions or

drains through which the surface water on the higher land is, in the course of nature, carried to the lower land. The authorities hold that the flow of surface water along such natural depressions or drains may be hastened, and incidentally increased, by artificial means, so long as it is not diverted from its natural course. The rule is well stated in *Dayton v. Drainage Commissioners*, 128 Ill. 271 (21 N. E. 198) :

"The defendant had no right at common law, as the owner of the dominant estate, to divert the waters of the slough into a channel wholly different from that in which they would naturally run. The rule undoubtedly is that the owner of a higher tract of land has the right to have the surface water falling or naturally coming upon his premises by rains or melting snow pass off through the natural drains upon or over the lower or servient lands next adjoining, and the owner of the dominant heritage has the right, by ditches and drains, to drain his own land into the channels which nature has provided, even if the quantity of water in that way thrown upon the next adjoining lower lands is thereby increased. But the owner of the higher lands has no right to open or remove natural barriers, and let onto such lower lands water which would not otherwise naturally flow in that direction. That would be to subject the servient heritage to an unreasonable burden, which the law will not permit, and against which the owner ought reasonably to have protection."

As to surface water, the same rule is applied to cities. *Robb v. Village of LaGrange*, 158 Ill. 21 (42 N. E. 77).

The owner of the upper estate may construct ditches and underground drains to hasten the flow of surface water into and along the natural depressions or drainways on his own land, so long as he does not divert the water from its natural course. *Bickel v. Martin*, 115 Ill. App. 367; *Vannest v. Fleming*, 79 Iowa 638; *Dorr v. Simmerson*, 127

Iowa 551; *Hull v. Harker*, 130 Iowa 190; *Meixell v. Morgan*, 149 Pa. 415 (24 Atl. 216).

In *Manteufel v. Wetzel*, 133 Wis. 619 (114 N. W. 91), we find the following language:

"\* \* \* where the upper proprietor does no more than collect in a ditch, which ditch follows the course of the usual flow of surface water, the surface water which formerly took the same course toward the land of the lower adjacent proprietor, and causes to pass through this ditch the surface water which formerly took the same course, but spread out over the surface, he has committed no actionable legal wrong of which the lower proprietor can complain, or upon which such lower proprietor can maintain an action. In other words, causing surface water to flow in its natural direction through a ditch on one's own land, instead of over the surface or by percolation, as formerly, where no new watershed is tapped by said ditch and no addition to the former volume of surface water is caused thereby, except the mere carrying in a ditch what formerly reached the same point on defendant's land over a wider surface by percolation through the soil or by flowing over such wider surface, is not, when not negligently done, a wrongful or unlawful act."

See, also, *Peck v. Herrington*, 109 Ill. 611 (50 Am. Rep. 627); *Aldritt v. Fleischauer*, 74 Neb. 66 (103 N. W. 1084); *Todd v. York County*, 72 Neb. 207 (100 N. W. 299, 66 L. R. A. 561).

We have treated this case, so far, as involving only surface water. We have done this because there is no proof in this record that any sewage from the city was discharged through this sewer upon plaintiff's land, and no nuisance is shown to be created from that source.

As to the first count of plaintiff's petition, based on the thought that the surface water was diverted from the city territory and reached plaintiff's land in a way in

which it would not have reached the land except for such diversion, we think the court was right in holding that no cause of action was shown.

As to the second count, involving the discharge of water from the electric light plant adjacent to plaintiff's property, we think the plaintiff has shown no cause of action, for the reason that he has made no basis for the assumption that he has suffered any damage by reason of this action on the part of the city. Unless damage to the plaintiff is shown to have resulted from the specific act charged, or damage is reasonably apprehended, he has no ground on which to base an injunction.

Upon the whole record, we think the court was right in dismissing plaintiff's petition, and its action is—*Affirmed.*

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.