I. J. STOUDER, appellee, v. GLEE C. DASHNER et al., appellants; CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, interpleaded defendant-appellee.

No. 47936.

(Reported in 49 N.W.2d 859)

NOVEMBER 13, 1951.

Cook & Drake, of Glenwood, for appellants.

Gilliland & Thomas, of Glenwood, for appellee.

Clark, Pryor, Hale, Plock & Riley, of Burlington, and L. T. Genung, of Glenwood, for interpleaded defendant-appellee.

SMITH, J.—The lands involved here are in Mills County, Iowa, not far from the Missouri River but separated from it by river bluffs which cause the natural drainage in that immediate vicinity to be away from the river and in a general easterly and southerly direction. Much of the area is very flat and the variations in level slight.

Plaintiff owns the Southwest Quarter and the South Half of the Northwest Quarter of Section 16, Township 71 North, Range 43, East of the Fifth P.M. Defendants Glee C. and Avanelle Dashner own the southeast quarter of the same section. Defendant Clay Dashner is the father of Glee and a former tenant of the land his codefendants now own.

A line (Council Bluffs to Kansas City) of interpleaded defendant, Chicago, Burlington & Quincy Railroad Company, runs north and south through plaintiff's land, so that about one hundred forty acres lie on the west side and the remainder on the east side of the railroad embankment. The railroad has been so situated for more than fifty years.

During those years (prior to 1947) surface water on plaintiff's land west of the railroad, on account of the embankment, could not go east but drained south across or through a thirty-six-inch tube or culvert under County Road No. 622 (briefly referred to as the "Rock Road") and on south across land in the Northwest Quarter of Section 21, formerly owned by C. R. Phelps, now belonging to one Powles.

Rock Road extends easterly from a north-and-south highway (county road G) on the west line of the section, approximately along the section line between Sections 16 and 21, across the railroad and along defendants' south line to a rock quarry on or near the east part of defendants' land. The record does not show its further easterly progress.

A ditch (known as old County Ditch) crosses defendants' land in a general northeasterly to southwesterly direction. It enters Section 16 across the east line of the Northeast Quarter of the section and crosses the Rock Road at a point somewhat more than eighty rods east of the southwest corner of defendants' land. A small road ditch along the north side of this road and east of the railroad may have served somewhat to carry surface

water, that came over plaintiff's land (east of the railroad) from the north, and to carry it eastward to the old County Ditch which in turn carried it south through a tube under and across said road and deposited it into a drainage district ditch referred to by the trial court as "a part of the improvement of the Mills-Fremont Drainage District."

Plaintiff claims that during all those years prior to 1947 the natural drainage of plaintiff's entire land would have been to the southeast over what is now defendants' land, had not the railroad embankment prevented such drainage of the land west of it, and compelled the surface water on that side to continue south over (or through the tube under) the Rock Road west of the railroad. There is evidence that the north part of the Phelps (or Powles) land (west of the railroad) was higher than plaintiff's immediately north of it and the result was that the water from the north (west of the railroad) would stand and create a swamp during rainy seasons. That would be on the right of way and in the southeast corner of plaintiff's and the northeast corner of the Phelps land, lying west of the railroad. There was no opening in the railroad embankment that would allow it to go east.

In the fall and winter of 1945 the county did some work on the Rock Road. A lot of surplus dirt was placed on it from a rock quarry along the foothills "about a half mile south from where the road connects with the hills" to the east. The road from the railroad over to the old County Ditch was thereby raised two or three feet. What had been an "ordinary grader ditch" along the north side of the road became filled with dirt in the process but at the request of plaintiff and others the next spring was cleaned out and the road "kind of shaped up."

In 1947 the county enlarged that ditch both east and west of the railroad, and the railroad company placed a thirty-six-inch concrete tube or culvert along it across the right of way from west to east. Prior to that time there had never been an outlet across the railroad right of way north of the Rock Road to permit surface water from the west to flow to the east. That change was while what is now the Dashner land belonged to one John Waller and was being rented and worked by defendant Clay Dashner. Defendants Glee and Avanelle Dashner acquired it February 7, 1949, from intermediate owners.

The present suit was commenced November 21, 1949. Plaintiff complained that in May or June 1949 defendants built a levee along the west and south sides of their land so as to prevent the flow of water from plaintiff's to defendants' land and placed an earthen dam across the road ditch near the southwest corner of their land, "thus absolutely blocking any and all drainage from the land of the plaintiff." In his petition plaintiff only referred to his land east of the railroad and made no claim of interference with drainage of his land west of it. He asked for both an injunction and damages.

Defendants promptly interpleaded the railroad company, alleged the construction or enlargement of the ditch by the county, and the placing by the railroad company of the thirty-six-inch culvert or tube across the right of way, and claimed they were thereby being damaged by being unlawfully compelled to receive the surface water from plaintiff's land lying *west* of the railroad. They counterclaimed for damages and prayed for a mandatory injunction for the removal of the thirty-six-inch concrete tube from under the railroad. The county was not made a party.

Defendant Clay Dashner disavowed interest in or responsibility for matters alleged by plaintiff but counterclaimed against plaintiff and the interpleaded defendant railroad company for damages for injury he allegedly suffered to crops while a tenant of the Dashner land in 1948—injury which he claims was caused by the construction or enlargement of the ditch and the installation of the concrete pipe across the railroad right of way.

The railroad company and plaintiff answered defendants' contentions by allegation that the changes made by the county and the railroad company were pursuant to a neighborhood plan agreed to or acquiesced in by John Waller who then owned what is now the Dashner land. They also argue the changes made in 1947 by installation of the concrete tube under the railroad and enlargement of the ditch lying along the north side of Rock Road merely resulted in carrying the water over to its natural outlet into the course of the old County Ditch and was not in fact a diversion of it.

The trial court held: the Dashner land is servient and plaintiff's land dominant; that the interruption by the railroad em-

bankment of the natural flow over a period of years did not change the natural watercourse or violate any rights of defendants; and that the acts defendants complain of merely restored the drainage to its natural course.

The decree in effect ordered defendants to remove all dikes and obstructions placed by them, permitted continued maintenance of the tube or culvert across the railroad right of way, and granted plaintiff and interpleaded defendant railroad company a permanent easement and right of drainage through the ditch along the north side of County Road No. 622 (Rock Road) east to the old County Ditch "now a part of the Mickelwait Drainage District." The court made no allowance to any party for damage to crops. Defendants have taken the present appeal. Plaintiff filed notice of appeal from the denial of his claim for damages but seems to have abandoned it.

The issue here is by stipulation limited to the respective rights of the parties as to the drainage of plaintiff's land that lies *west* of the railroad. At the commencement of the trial defendants stipulated they did not deny plaintiff's right to drain his land (lying east of the railroad ) "south and east to the road [Rock Road] and thence to the [old] county ditch."

And defendant Clay Dashner stipulated he was claiming no damage for destruction of his crops "because of any water flowing * * * from the Stouder land *east* of the railroad." The stipulations were however limited to such use of the road ditch as existed "prior to the placing of this 36-inch tube under the railroad." And further clarifying: "We will admit we filled the ditch and plugged it for the purpose of keeping the water from the west side off our land."

I. We have carefully studied the engineering and other evidence both oral and visual and conclude there is not serious disagreement as to the natural lay of the land both east and west of the railroad embankment.

Merritt Powell, a graduate civil engineer, testifying for defendants, says: "The general trend of drainage in that particular area is to the south. It goes just a little east of south * * * but it's mostly south." Again he says, testifying from the plat he had prepared showing elevations at various points: "From these

elevations I would say the ground is very flat. The pronounced slope is from the north to the south. It is very flat from west to east."

But he is speaking particularly of the Dashner land and plaintiff's land near the center of the section, that is, east of the railway. The map he submits shows very few elevations taken west of the railroad—not enough in number to permit a sound judgment as to that part of the area. He shows no elevations on the Powles (Phelps) land in the Northwest Quarter of Section 21 immediately south of plaintiff's land west of the railroad. There is no evidence the slope down to the east from the high ground nearer the river leveled off before it reached Section 16.

According to the testimony of Allen Watts, a former county supervisor and a lifetime resident of the region: "It [the drainage west of the railroad] went under [the Rock Road] * * *. When the water got high enough at the north end of the Powles land, it would flow south * * * and then east under the railroad tracks. And after it passed under the railroad track, it would flow east."

And plaintiff's engineer witness, Roy Towl, says the Powles land west of the railroad and south of the Rock Road "is not as low relatively as (is) the Stouder land north of the road." Defendants' witness Powell points out that the bottom of the new culvert or concrete pipe (under the railroad) is two feet lower than the bottom of the north end of the similar one running south under the Rock Road through which the drainage west of the railroad was formerly expected to go. Before the railroad tube was installed the water in that corner would be two feet deep before it could flow south under the road. As they now lie, drainage under the road will begin when the railroad tube is two-thirds full. This is important in time of sudden flood, and suggests that a part of defendants' damage from the June 1949 flood was due to the fact that the culvert or tube under the road may have been "plugged", as some witnesses testify it was.

Engineer Towl, testifying from his own knowledge and using a plat prepared (by another engineer) for use in another proceeding, says "unquestionably the general slope" of plaintiff's land west of the railroad is from the northwest to southeast and if the

railroad track were not there the water on the Stouder land west of the railroad and north of Rock Road would drain south and east over to the old County Ditch. He says the old County Ditch, north of Rock Road, and the old Mills-Fremont Ditch which continues on south from the road, follow the low ground down to Waubonsie Lake, "the old dumping ground for the Mills-Fremont Ditch" and that the present ditch of the Lorimor Inter-County District follows the old Mills-Fremont course until it takes off on a diversion from the natural drainage over to the Missouri River.

Engineer Powell suggests another somewhat significant fact: that on plaintiff's land between the railroad and Dashner's there is a "definite [north-and-south] ridge of approximately half a foot that runs from a point about 250 feet east of the railroad" extending north "practically parallel to the railroad" and up to the "north central part of the Stouder land." He says the drainage in that area is south, but "there is a portion of it that would go towards the railroad and * * * a portion that would tend to go away from the railroad * * *. There would be a tendency for some of the water in that area to go toward the railroad and south." Ross Powell confirms the presence of this ridge.

This testimony may in part justify defendants' concession, made at the beginning of the trial, as to plaintiff's right to drain that area south to Rock Road and thence east to the old County Ditch.

There is sound reason to believe the drainage of plaintiff's west land would, if the railroad grade were not there, follow substantially the same pattern, running south and then easterly along the road ditch eastward to old County Ditch. The somewhat higher ground in the north part of the Powles land would tend to deflect it in that direction. And the small ridge testified to by engineer Powell would account for the southern tendency of what came from the west.

 We agree with the conclusion of the trial court as to the physical situation as it would have been in the absence of the railroad grade and County Road No. 622 or Rock Road. The drainage of the entire area would be over to the old County Ditch.

1348

II. The law of Iowa is well settled as to the respective rights and duties of owners of adjoining dominant and servient estates in the matter of surface water. Extensive citation showing the general rule seems unnecessary. It has been stated that we have never adopted either the "common enemy" rule of the common law which places no restriction on the right of the servient owner to repel surface water, or the rule of the civil law which places a servitude upon the lower land to receive all that may come in the natural flow or passage of the water. Fennema v. Menninga, 236 Iowa 543, 545 et seq., 19 N.W.2d 689; Matteson v. Tucker, 131 Iowa 511, 516, 517, 107 N.W. 600.

The rigid rule was adopted in our early case of Livingston v. McDonald, 21 Iowa 160, that "the owner of the higher land has no right, even in the course of the use and improvement of his farm, to collect the surface water upon his own lands into a drain or ditch, increased in quantity or in a manner different from the natural flow, upon the lower lands of another, to the injury of such [lower] lands." (Quotation from headnote.)

But this rule has been modified in the interest of agriculture to permit the upper proprietor to drain his land into a natural watercourse without liability to a lower proprietor for resulting damages, although the effect is to throw the surface water in somewhat increased volume at times on the servient estate. Martin v. Schwertley, 155 Iowa 347, 351, 136 N.W. 218, 40 L. R. A., N. S., 160; Board of Supvrs., Pottawattamie County v. Board of Supvrs., Harrison County, 214 Iowa 655, 669, 241 N.W. 14; Johannsen v. Otto, 225 Iowa 976, 978, 282 N.W. 334.

■ It is to be pointed out that under modern definition a definite channel with well-marked sides or banks is not essential to a watercourse. Hunt v. Smith, 238 Iowa 543, 557, 28 N.W.2d 213; Heinse v. Thorborg, 210 Iowa 435, 437, 230 N.W. 881.

■ And by the weight of authority a dominant proprietor may cause surface water to flow in its natural direction through a ditch on his own land, instead of over the surface or by percolation as formerly, where no new watershed is tapped, and where no addition to the former volume is caused thereby, except the mere carrying in a ditch of what formerly reached the same point on the servient tract over a wider surface by percolation through the soil or by flowing over such wider surface. 56 Am. Jur.,

Waters, section 73, note 6, citing Lessenger v. Harlan, 184 Iowa 172, 178, 168 N.W. 803, 5 A. L. R. 1523. See Manteufel v. Wetzel, 133 Wis. 619, 114 N.W. 91, 19 L. R. A., N. S., 167, and L. R. A. case note.

We think this rule applicable here. Plaintiff's surface water west of the railroad now reaches the outlet that would be its natural destination over a wider surface if no railroad embankment stood in the way. Defendants cannot complain that it comes in somewhat increased volume over or through a narrower channel.

III. Defendants argue that before installation of the thirty-six-inch concrete tube under the railroad in 1947 the land west of the railroad constituted one watershed or drainage area and the land east of the railroad another: "In 1949, following a big rain, the water from the Stouder land west of the railroad drained in immense quantities through this railroad tube into the ditch on the north side of the County Road over the banks of the ditch, inundating the Dashner land. * * * never before, that is, prior to 1947, had any of this water gone east onto the Dashner land, and it only" did so then "because of the construction of the tube."

The condition prior to 1947 referred to by defendants was of course an artificial one, existing since and created by, the construction of the railroad more than fifty years earlier. We have therefore to inquire whether defendants and their predecessors in title have thereby acquired any rights by limitation or prescription as against the interpleaded defendant railroad company and others in the involved area.

Unfortunately for any such contention our decisions are quite unanimously against it. It is true defendants' land has for many years been shielded by the railroad embankment from surface water from the dominant land west of it. But it has acquired no prescriptive right to such protection. Bones v. Chicago, R. I. & P. Ry. Co., 145 Iowa 222, 229, 120 N.W. 717; Hinkle v. Chicago, R. I. & P. Ry. Co., 208 Iowa 1366, 227 N.W. 419; King v. Chicago, B. & Q. Ry. Co., 71 Iowa 696, 698, 29 N.W. 406, 407. It was said in the King case: "Before its [defendant's] railroad was constructed, the water naturally flowed through the slough, and

found its way onto plaintiff's premises * * *. Very clearly plaintiff had no right originally to demand that the embankment should be so constructed and maintained as to form a protection to his premises against the water."

And in the Bones case, supra, it was said (145 Iowa at page 229) : "If the maintenance of the railway grade has had the effect heretofore of protecting O'Connell's land on the east from the floods that come from the west, he has acquired no right thereby to a continuance of such structure; if the railway company should choose to substitute trestle work for its grade, it would be within its rights."

The distinction between the rule as to individual landowners and that involving drainage through or across railway grades is mentioned and adhered to in Brainard v. Chicago, R. I. & P. Ry. Co., 151 Iowa 466, 468, 131 N.W. 649. The rule is consistent with the usual one where rights of the public are involved. See discussion and cases cited in Droegmiller v. Olson, 241 Iowa 456, 462, 463, 40 N.W. 2d 292. Neither the statute of limitations nor prescriptive rights can be urged or claimed against the public. Brightman v. Hetzel, 183 Iowa 385, 395, 167 N.W. 89; Schwartz v. Wapello County, 208 Iowa 1229, 1232, 227 N.W. 91. For a case with facts somewhat analogous to those shown here, see Hinkle v. Chicago, R. I. & P. Ry. Co., supra, 208 Iowa 1366, 227 N.W. 419.

IV. Plaintiff and the interpleaded defendant railroad company plead that the 1947 installation of the thirty-six-inch pipe across the railroad right of way where it is crossed by the Rock Road, and the enlargement of the road ditch along the north side of the Rock Road were under and pursuant to a plan agreed upon at a neighborhood meeting held at the site of this controversy in 1947. Plaintiff and his son, Ross Stouder, C. T. Phelps, the then owner of land in the northwest quarter of Section 21 already mentioned, possibly several members of the county board of supervisors, county engineer Davis, John Waller, then the owner of the present Dashner land, and one Mayberry, the operator of a dragline for the county, were present. Possibly there were two such meetings.

It does not appear that any representative of the railroad

company was present but it is made to appear reasonably certain that the later installation of the drainpipe under the railroad, and the work later done by the county on the ditch lying along the north side of the Rock Road were the outgrowth of such meetings.

Mr. Waller was a witness for defendants and admits taking some part in the conversation:

"I asked them if they would dig a ditch there. * * * They had hauled the rock and clay in there and made a grade, and there was no sign of a ditch. All of this water west and north of this hit this grade and came to the corner of the farm [southwest corner of his own, now the Dashner land] and went up and made a big horseshoe and stood out there and finally worked out the big end of it; what didn't stand would dry up."

This was of course before the installation of the pipe under the railroad and refers to the water that had come down over the land east of the railroad. Mr. Waller says further:

"A. Yeah, we talked about it. I wanted him to dig a fair sized—I wanted him to throw the dirt north and make a little dike out of it and try and hold the water and to get it down to the other. The engineer said he had to show an improvement to the road and slope it against the road. I said 'Okay, go ahead.' Q. Was there anything said up to that time about a tube under the railroad? A. Mr. Stouder spoke up and said it would help us to put a tube under the railroad. I remember saying that if it would help, that would be fine. I didn't want any more water; I couldn't handle what was getting in, but I really figured that water would go west, but in place of that it come east; west of the railroad it come in east."

In response to a question as to whether he ever gave permission to drain any water from the west side of the railroad his answer was: "None that I know of. I don't remember giving anybody any."

On his cross-examination it appears there were two meetings down there, "one when the County Board was there and one when they wanted to change the tube under the crossing, and talked about digging a ditch—just the County Board at one time."

It is impracticable to set out more of his testimony, which is brought to us almost completely in question-and-answer form. It is sufficient to say our conclusion from his testimony and that of Ross Stouder, Phelps, county engineer Davis and the dragline operator must be that the plan for the installation of the tube and the enlarging of the ditch was discussed and must have been understood and at least acquiesced in by Mr. Waller. His naïve explanation that he expected the water to flow west is not too convincing, nor is his halfhearted denial that he gave permission for the change.

On the other hand, the testimony of Mr. Phelps and of the county engineer as to Mr. Waller's part in the conversation is not too definite. Others who were present did not testify. The county engineer said: "I don't remember any conversation with Mr. Waller * * * but I was under the impression that everybody knew the pipe was to go in there."

Ross Stouder testified to one occasion when the county dragline machine which dug the ditch approached the corner of the Dashner land. The county engineer and the dragline operator and Mr. Waller were there: "Mr. Waller didn't think the ditch was big enough to take care of that water * * * that came down from the west of the track."

The dragline operator testified: "Waller wanted to widen the ditch"; and that when the engineer told him they would have to go north on his land to make a wider ditch Mr. Waller said it was all right with him—"and we then went ahead with the construction of the ditch * * * to the point that the county engineer and Mr. Waller had indicated."

We might quote at greater length from the record but have set out enough to show the trend of the testimony. Plaintiff, eighty-seven years old at time of trial, did not testify. Nor did any member of the county board of supervisors who was present at the neighborhood meeting. It sufficiently appears the changes made in 1947 were the result of some general neighborhood understanding to which Waller, defendant's predecessor in ownership of the farm, was more than an acquiescent party. He must have known the purpose of these meetings was to plan on the method of caring for the additional drainage from west of the railroad.

We have held the result of the changes was to bring the water, from west of the railroad, over to the old County Ditch where in the natural course of drainage it belonged. Whether this was done without unnecessary injury to defendants we need not inquire in view of the fact Mr. Waller, then owner of the land, was a virtual party to the arrangement by which it was done. Were he still the owner he could not maintain an action for damages growing out of the plan. The effect of the discussions by the parties was the creation of an easement permitting the channeling of the water from west of the railroad to its natural outlet in the particular manner and route actually pursued. We think defendants, as successors of Waller in ownership, must be charged with notice of the arrangement.

That such easement may be created by construction of a ditch under an oral agreement, where time or money has been expended in its construction, see Brown v. Honeyfield, 139 Iowa 414, 417, 116 N.W. 731, and cases cited. And subsequent owners of land burdened by an apparent easement not based upon any written instrument are charged with notice thereof where a reasonably careful inspection of the premises would disclose its existence. McKeon v. Brammer, 238 Iowa 1113, 1120, 29 N.W.2d 518, 174 A. L. R. 1229.

We are persuaded the trial court here reached the correct result upon both grounds we have pointed out. As so frequently happens in human affairs, mathematically exact justice is not possible where the handling of surface waters in time of flood is concerned. The damage to adjoining lands can only be distributed by the application of general rules designed to approximate justice. We think the decree of the trial court must be affirmed and it is so ordered.—Affirmed.

All JUSTICES concur.