341 A.2d 735.

EDWARD J. BUTLER *et ux. vs.* JOSEPH BRUNO.

JULY 30, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. During the summer season, the litigants, presently before us are next-door neighbors. The plaintiffs are husband and wife. They seek damages which result from the defendant's deflection of surface water from his property onto their premises. A nonjury trial was held before a justice of the Superior Court. At the conclusion of the presentation of all the testimony, the trial justice found for the defendant. The plaintiffs have appealed.

In 1961, the Butlers purchased a summer home. It is located in the Sand Hill Cove section of the town of Narragansett on Maple Avenue. There they have enjoyed many a pleasant and restful summer playing croquet and whiffle ball on the lawn, mowing the grass, and doing the usual things one is supposed to do in a season which one lyricist has described as a time when "the livin' is easy." In 1969, Bruno purchased a number of undeveloped lots on Maple Avenue, one of which was contiguous with and ran along the easterly boundary of the Butler property.

Past and present residents of the area described the Bruno lot as having been a swamp or marshland before he began building on it. One witness told how when he went on the property to pick cattails he would have to wear rubbers because of the mud and water underfoot. There were witnesses who testified that the Bruno lot was lower in elevation than the surrounding lots and that consequently it served as a depository for the rainwater runoff coming from the adjoining easterly and northerly

areas. The Butlers' property, they said, was at all times higher in elevation than the Bruno lot and was always dry.

Bruno began building activities in August 1970. He first spread 3 feet of gravel over the entire lot. This step was necessary because of the high-water table over his land and as a prerequisite of the State's approval of his proposed sewage disposal system. The home was built on top of the fill and by the spring of 1971 it was ready for occupancy. Bruno had a retaining wall built along the Butlers' property line. The wall, which was composed of asphalted wooden beams, was designed to hold the fill. The fill had been graded to taper toward the front and rear of the lot. However, Bruno failed to provide any drainage for the surface water that had previously flowed onto his land from the properties to the west of his lot.

The Butlers told the trial justice that once Bruno commenced filling in his land, their property took on the appearance of one massive puddle with the water flooding the rear portion of their premises for most of the year. Their sewerage system became inoperative as the sewage backed up into the house.

The trial justice found that before Bruno began building the surface water had flowed from west to east and would gather on the Bruno lot. He also found that the additional 3 feet of fill and the construction of the retaining wall stopped the easterly flow of the surface water, causing it to flood the Butler property. The trial justice observed that if he were to rule that Bruno was liable to the Butlers, he would order the entry of a money judgment in their favor for $5,200. This sum was the figure used by a real estate expert in estimating the loss of value of the Butler property which was attributable to the flood.

At this juncture, the trial justice ruled that the Butlers' loss was *damnum absque injuria,* or in the vernacular,

while the Butlers sustained damages, there could be no recovery because Bruno did not violate any recognized legal or equitable right. In making this observation, the trial justice commented on the paucity of precedent to guide him, and after examining the literature that has been written in this area of the law, accepted as the law of this state the so-called "common-enemy" doctrine as modified by the rule of "reasonable use." He thereupon held that although the Butlers had sustained damage, there would be no recovery since Bruno had used "reasonable care" in developing his property and he had not "unnecessarily injured" the Butlers.

We cannot fault the trial justice's attempt to decide what is or should be the surface water law of this jurisdiction. It is true that at the turn of the century this court, in deciding an issue different from the one now before us, assumed that the common-enemy doctrine was the law of Rhode Island. *Johnson* v. *White*, 26 R. I. 207, 58 A. 658 (1904). We will, however, opt for another rule which shall be discussed after we first define the term surface water and discuss the various views which have been expressed by courts which have considered the rights of neighboring landowners and the damages resulting from the diverting of surface water.

As used in this opinion, the term surface water means the water from rains, springs, or melting snows which lies or flows on the surface of the earth but does not form part of a well-defined body of water or a natural watercourse. It does not lose its character as surface water merely because some of it may be absorbed by or soaked into the the marshy or boggy ground where it collects. *Enderson* v. *Kelehan*, 226 Minn. 163, 32 N.W.2d 286 (1948).

There are three basic rules which have been used to resolve the surface water disputes that have arisen in the United States.

The first is the common-enemy doctrine. The common-enemy doctrine is so named because at one time surface water was regarded as a common enemy with which each landowner had an unlimited legal privilege to deal as he pleased without regard to the consequences that might be suffered by his neighbor. This rule received judicial approbation in a time when the law held in high regard one's freedom to do with his land as he wished. One of the earliest cases to espouse this view was *Gannon* v. *Hargadon,* 92 Mass. (10 Allen) 106 (1865). New Jersey was the first jurisdiction to describe the rule by employing the phrase "common enemy." *Town of Union* v. *Durkes,* 38 N.J.L. 21 (1875). Several courts in adopting this rule have said that it encourages the development and improvement of real estate and clearly delineates the rights of all interested parties. Concededly, litigation is kept to a minimum because in its application no one's rights are invaded. However, the simplicity of the rule does create problems, for, as one commentator has expressed it:

> "* * * landowners are encouraged to engage in contests of hydraulic engineering in which might makes right, and breach of the peace is often inevitable." Maloney & Plager, *Diffused Surface Water: Scourge or Bounty,* 8 Nat. Resources J. 73, 78 (1968).

The Butlers might have invoked the common-enemy rule. The engineer testified that they could have alleviated their drainage problems by raising the level of their land with fill. Such a step, the witness said, would cause the surface water to gather and accumulate on the land of the Butlers' westerly neighbor. Presumably, if the Butlers were to pursue this remedy, they, rather than Bruno, would be the defendants as the domino theory of litigation enveloped the Maple Avenue residents. One obvious drawback to the common-enemy approach is the risk that its adoption can encourage a proliferation of litigation and engender neighborhood ill will.

The second principle upon which some courts have relied in resolving surface water disputes is called the "civil-law" rule.

The civil-law rule was first adopted in this country by Louisiana in 1812. *Orleans Navigation Co.* v. *New Orleans,* 2 Martin (O.S.) 214 (1812). It is said to have its roots in Roman Law and the Napoleonic Code. Annot., 59 A.L.R.2d 421, 429 §5 (1958). The rule is usually expressed in terms of an easement of natural drainage so that the owner of the lower land must accept the surface water which naturally drains onto his land but the upper owner may do nothing to increase the flow. Expressed in a more precise manner, the rule is that "A person who interferes with the natural flow of surface water so as to cause an invasion of another's interests in the use and enjoyment of his land is subject to liability to the others." Kinyon & McClure, *Interferences with Surface Waters,* 24 Minn. L. Rev. 891 (1940). The civil-law rule has the virtue of predictability in that it tells a prospective purchaser or acquirer of a parcel of real estate just what is expected of him. If it is applied to the letter, the rule can impede the physical and economic development of a locality. Its application can cause an evidentiary problem as the courts seek to determine what was the exact course of the "natural flow" of the surface water before the bulldozers arrived on the scene.

Both the common-enemy and the civil-law rules are encrusted with the verbiage that is usually associated with the law of real property. When they are used, one hears such terms as easements, the dominant estate, the servient estate, and servitudes, and the classicist has the opportunity to try his hand at translating such ponderous Latin phrases as *cujus est solum, ejus est usque ad coelum et*

*ad infernos*[1] or *aqua currit, et debet currere ut currere solebat.*[2]

Because of the harsh and often inequitable consequences of a strict application of either rule, courts through the years have created numerous exceptions, distinctions, and permutations to alleviate otherwise unjust results. Sometimes these modifications have caused the two antithetical doctrines to produce the same results. Thus, although the basic common-enemy rule allows each owner a *carte blanche* to deal with unwanted surface water, courts have held that the owner may not discharge the unwanted water upon neighboring land by collecting it into a concentrated flow by artificial means and then discharging it, if by so doing he causes his neighbor injury. *E.g., Johnson* v. *White, supra.* And although the basic civil rule held that no one may change the natural drainage flow, some courts have recognized that the upper owner may change the natural flow by collecting the water at one point thereby not increasing the amount of overall flow but causing greater volume at one point rather than another, so long as the increased flow is in a natural water course and injury is not too great to the lower land. *Stouder* v. *Dashner,* 242 Iowa 1340, 49 N.W.2d 859 (1951), and cases cited in Kinyon & McClure, *supra,* at 921 et seq.

This convergence of the two theories has been aptly described as creating a situation in which "* * * the civil-law owner may *never* drain his land *except* by following the natural drainage, but the common-enemy owner may *always* drain his land except that he may not use artificial channels. The civil-law owner may *never* obstruct the natural flow of surface waters *unless* he acts reasonably,

---

[1]"To whomever the soil belongs, he owns also to the sky and to the depths."

[2]"Water runs, and ought to run as it is accustomed to run."

while the common-enemy owner may always obstruct the flow *if. he acts reasonably.*" Maloney & Plager, *supra,* at 79.

A common modification of both rules holds that the landowner may change the flow of surface waters by either increasing or damming up the flow so long as he does so "in good faith" or "nonnegligently" or "in a reasonable manner."[3] This is the modification to which the trial justice alluded and which he tacked onto the common-enemy rule.

The effect of these modifications is to bring disputes over surface water interference into the realm of modern tort concepts, and to depart from the rigid formulations of property law. Thus, civil-law jurisdictions are now more chary about awarding either equitable or monetary relief for a mere technical trespass upon plaintiff property owners' rights, requiring instead a finding of "unnecessary injury." *See, e.g., Schmitt* v. *Kirkpatrick,* 245 Iowa 972, 63 N.W.2d 228 (1954); *Cowan* v. *Baker,* 227 Miss. 828, 87 So.2d 74 (1956). Common-enemy jurisdictions now recognize that the absolute right to fend off surface waters can be limited by the requirement that it not cause another "unnecessary harm." *See, e.g., Stacy* v. *Walker,* 222 Ark. 819, 262 S.W.2d 889 (1953).

It is interesting to note that the court in *Johnson* v. *White, supra,* while alluding to the owner's right to fend off the surface water on his land as he pleased, in almost the same breath qualified the common-enemy rule by remarking that the owner was not privileged to discharge by artificial means upon the adjoining property large quantities of surface water. This exception is said to be

---

[3]*See, e.g., Chamberlain* v. *Ciaffoni,* 373 Pa. 430, 96 A.2d 140 (1953); *Seventeen, Inc.* v. *Pilot Life Ins. Co.,* 215 Va. 74, 205 S.E.2d 648 (1974), applying the modification to the common-enemy rule; and *Ratcliffe* v. *Indian Hill Acres, Inc.,* 93 Ohio App. 231, 113 N.E.2d 30 (Ct. Appls. 1952), applying the modification to the civil-law rule.

a judicial recognition of another Latin maxim, *sic utere tuo ut alienum non laedas.*[4] *Norfolk & Western R.R.* v. *Carter,* 91 Va. 587, 22 S.E. 517 (1895).

Other courts, perhaps in recognition of the problems that have arisen by the application of the above two rules with all their modifications, have chosen a third doctrine. Instead of using the tort concepts as an overlay to mitigate the harsh results of the property law doctrine, they have instead created the standards for behavior entirely out of tort law, and abandoned the notions of servitude or absolute ownership.

Thus we come to the third surface water doctrine, which is generally known as the "rule of reasonable use." Under this rule, the property owner's liability turns on a determination of the reasonableness of his actions. The issue of reasonableness is a question of fact to be determined in each case upon the consideration of all the relevant circumstances. This approach was first employed in *Swett* v. *Cutts,* 50 N. H. 439, 446 (1870).

The doctrine of reasonable use is not the same as the reasonable-use modification to the common-enemy rule referred to and adopted by the trial court below.[5] Although there has been some confusion due to the striking similarity in the names of the two standards, and both have strong roots in tort law, they do differ.

It will be remembered that the reasonableness modification rests on determinations of "negligence," "malice," and "good faith." Absent negligence, or an intentional

---

[4]"So use your property as not to injure the rights of another."

[5]The trial justice at the time he spoke of the "reasonable use modification" was discussing an annotation entitled *Liability as regards surface waters, for raising surface level of land.* Annot., 12 A.L.R.2d 1338 §3 (1950). This section describes cases which carve out exceptions to the common-enemy rule. They in no way relate to the cases which embrace the rule of reasonable use.

injury, the common-enemy or the civil-law rule would be applied. The New Hampshire rule of reasonable use does not rest on negligence, nor does it focus solely on the character of the property owner's action. Instead, it focuses on the results of the action, the consequent interference with another's use and enjoyment of his land— much like the nuisance branch of tort law.[6]

The New Jersey Supreme Court in adopting the rule of reasonable use expressed it in this manner:

> "* * * each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable." *Armstrong* v. *Francis Corp.*, 20 N. J. 320, 327, 120 A.2d 4, 8 (1956).

The jurisdictions which have adopted this principle have set forth varying formulations of the test for determining liability. We find the clearest and most appropriate to be that adopted by Minnesota and expressed in *Enderson* v. *Kelehan, supra,* where the court considered the following factors:

(a) Is there a reasonable necessity for such drainage?

(b) Has reasonable care been taken to avoid unnecessary injury to the land receiving the water?

(c) Does the benefit accruing to the land drained reasonably outweigh the resulting harm?

(d) When practicable, is the diversion accomplished by reasonably improving the normal and natural sys-

---

[6]This court has given recognition to the fact that the invasion of one's property by surface waters can be a nuisance, no different from an invasion by noise, noxious vapors, or the like. *Sweet* v. *Conley,* 20 R. I. 381, 385, 39 A. 326, 328 (1898), "[t]o wrongfully and illegally cause the surface water of a street to collect and remain in front of one's premises, so as to materially injure and damage him in the use and enjoyment thereof, is a nuisance * * *."

tem of drainage, or if such a procedure is not practicable, has a reasonable and feasible artificial drainage system been installed?

At one time only two jurisdictions, New Hampshire and Minnesota, had adopted the reasonable-use rule. Since that time, however, at least nine other jurisdictions[7] have embraced this view. In determining one's legal responsibility for the use of the surface water flowing across his land, we shall adopt the rule of reasonable use. One known advantage of the rule is its flexibility. It can be applied in situations unthought of in the day when surface water was truly considered to be the common enemy. Unlike the civil-law rule, it will not hamper land development, and in contrast to the common-enemy rule, the standard which we embrace today will permit a more equitable allocation of the costs of such improvements, for the owner improving his land must take into consideration the true cost of such development to the community.

In embracing the principle of reasonable use, we are aware of those whose support of either of the two property-based rules is based on their conviction that adherence to either rule gives to a concerned landowner the advantage of predictability. However, such a belief overlooks the fact that today as we enter the last quarter of the 20th century, no jurisdiction follows the strict requirements of either the common-enemy or the civil-law rule. With the numerous judicial exceptions and modifications that have been appended through the years to

---

[7]*Weinberg* v. *Northern Alaska Dev. Corp.*, 384 P.2d 450 (Alas. 1963); *Keys* v. *Romley*, 64 Cal.2d 396, 412 P.2d 529, 50 Cal. Rptr. 273 (1966); *Rodriques* v. *State*, 52 Hawaii 156, 472 P.2d 509 (1970); *Klutey* v. *Commonwealth of Ky., Dep't of H'ways*, 428 S.W.2d 766 (Ky. 1968); *Armstrong* v. *Francis Corp.*, 20 N. J. 320, 120 A.2d 4 (1956); *Jones* v. *Boeing Co.*, 153 N.W.2d 897 (N. D. 1967); *Houston* v. *Renault, Inc.*, 431 S.W.2d 322 (Tex. 1968); *Sanford* v. *University of Utah*, 26 Utah 285, 488 P.2d 741 (1971); *State* v. *Deetz*, 66 Wis.2d 1, 224 N.W.2d 407 (1974).

the two original concepts, we fail to see how the modern versions of either afford more predictability than the rule of reasonable use. However, even if we were to assume that each did possess a higher predictability factor, a desire for certainty of liability should not and must not serve as a judicial pardon for the unreasonable conduct which has been manifested by any landowner in our modern society. *Keys* v. *Romley,* 64 Cal.2d 396, 412 P.2d 529, 50 Cal.Rptr. 273 (1966).

Since the trial justice rested his decision on a theory that is completely at odds with the ultimate holding of this appeal, we must reverse and remand for further proceedings so that a new judgment which conforms to this opinion may be entered.

The plaintiffs' appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court.

Mr. Justice Joslin, dissenting. The majority today hold that a landowner's liability for the diversion of surface water from his land to that of another hinges in each case upon a factual determination of whether in view of all the circumstances his conduct in the use and improvement of his property is reasonable or unreasonable, and they enunciate four guidelines to aid the factfinder in making that determination. Because I believe that the proposed factual test is no "rule" at all and that it fails to provide a landowner any reasonably certain standards governing the use of his land, I respectfully dissent.

It may well be that unless specific exceptions are made both the common-enemy doctrine as presently prevailing

in this state[1] and the civil-law rule lack the flexibility to lead to the fairest result in a particular case, and that the concept of "reasonable use" reflects better than either of those rules contemporary sentiment toward the use and development of real property in light of the interests of neighboring owners. But in my opinion neither the majority nor the decisions they cite have defined that concept as a principled standard of law, with sufficient certainty to enable counsel to advise a landowner-client how he may use his property without incurring liability for surface water diversion. The requirement that a landowner thus either proceed at his peril or resort to the courts is an excessive burden. For that reason, until adequate reasonable-use standards are formulated this court should adhere to its present rule, which sets forth its requirements with precision, clarity, and certainty, and which can from time to time, if the occasion demands, be fully reviewed and further refined.

*Kenneth M. Beaver,* for plaintiffs.

*John F. Dolan,* for respondent.

---

[1] *See Johnson* v. *White,* 26 R. I. 207, 208, 58 A. 658, 659 (1904); *Wakefield* v. *Newell,* 12 R. I. 75, 77 (1878), where the court said in *Johnson*
"[t]hat no one has a right to collect surface water in any considerable quantity upon his own premises and then turn the same in a concentrated form upon the premises of his neighbor in such a manner as to cause him damage. Not that an owner of land may not so change the grade or surface thereof as to cause surface water to flow in a different direction from what it did before the natural contour thereof was changed, for this such owner doubtless may lawfully do. But he may not collect and concentrate such water, by means of drains or otherwise, and turn it upon his neighbor's land in a volume * * *"
and in *Wakefield:*
"* * * mere neglect by an individual to retain on his own land water which, falling there, would naturally flow onto his neighbor's land, is no cause of action, unless he first accumulates it by artificial means so as considerably to increase the volume and detrimental effect with which it would flow on his neighbor's land."