**ELOY TORRES and MARIA TORRES, Plaintiffs**

**v.**

**JOAN BENNETT, Defendant**

Civil No. 650B/1976

Territorial Court of the Virgin Islands

Div. of St. Croix

June 15, 1977

444

BLONDELL L. MOREY, ESQ. (JEAN–ROBERT ALFRED, ESQ.), Christiansted, St. Croix, *for plaintiffs*

EDWARD J. OCEAN, ESQ., Christiansted, St. Croix, *for defendant*

SILVERLIGHT, *Judge*

This is an action for damages and for injunctive relief arising out of an alleged negligent interference with the flow of surface waters.

The narrative following, for the purposes of Rule 52 F.R.C.P., shall be deemed to set forth the findings of facts and conclusions of law of the Court.

Prior to the commencement of trial, at the request and with the consent of counsel for both parties, the Court made an on-site inspection of the two parcels of land involved in this litigation. These parcels are described as Plot No. 55 of Estate Rattan, the record owners of which are Eloy and Maria Torres (hereinafter "Torres"); and Plot No. 56 of the same Estate, adjoining Plot No. 55 aforesaid, generally to the west, owned by Joan Bennett (hereinafter "Bennett").

The on-site examination disclosed that Plot No. 56 is an upland parcel and Plot No. 55 is a downland parcel. The grade of the land rises at an angle of approximately 45° from the common boundary line between the two plots in a general easterly and southerly direction. Presently on the subject properties, and partly on each plot, is a cinder block wall about 4 feet high, extending the full length of said common boundary line from north to south. At a height of about 8 to 12 inches from the ground, at approximately 3 to 4 foot intervals, individual blocks have been laid exposing the openings, thereby permitting water to flow through. Approximately 15 to 20 feet east of said wall, and generally in the middle of Plot 55, is the Torres dwelling house. Between the house (but connected thereto) and the wall, is a carport, the floor of which is approximately 12 inches above ground, made entirely of concrete.

There is also a cinder block wall, containing no openings, along the easterly boundary of Plot No. 55, approximately 12 inches high, atop which is a chain link fence about 5 feet high which fence continues along the entire southerly boundary.

In the southern one-third of Plot No. 55 is an area of very hard-packed earth, showing clear traces of caliche, and

some sparse growth of grass. In addition, there are some small eroded tracks, clearly the result of a concentrated flow of water. These eroded areas are, however, of minimal consequence.

The Torres house was completed in or about September, 1974, before any construction was commenced by Bennett. This was immediately before the unusually heavy rains and floods experienced here in November, 1974, but which caused no surface water problems on the Torres property. The Bennett property was, at that time, completely covered with brush, ground cover and other wild growth, permitting considerable absorption of surface waters but otherwise allowing surface water to flow naturally.

Improvement of the Bennett plot commenced several months after completion of the Torres house, the first step being the bulldozing of the entire plot. This removal of all foliage caused some large stones (characterized as boulders by Torres), to roll onto Torres' land and, in heavy rainfall, caused a washing down of whatever top soil remained, followed by deposits of caliche and stones, pebbles and small rocks. Torres was required to hire men, costing in excess of $200, to remove these rocks, "boulders," and stones by pushing them into the southwest corner of Torres' plot. This condition intensified when Bennett's property was excavated for the house foundation.

At this point, the washing down of caliche and the like became so pronounced, in heavy rainfalls, that Torres was required to dig a ditch, breaking the flow of water, thereby preventing the piling of debris against their carport.

As construction on the Bennett plot continued, it became apparent that steps had to be taken to protect Torres' property from the ravages of flowing surface water and debris. It was then that Bennett introduced the idea of building a wall between their properties for "safety." Clearly, this term, as used by Bennett, can only be

interpreted to mean safety from continued washing down of debris.

Bennett contacted one Calvin Rogers, an employee of WICO, who prepared an estimate of the cost of the wall, designed the wall, and hired the men to construct it, according to the undisputed testimony of Hastings Henry, a mason who assisted in its construction. The undisputed testimony of Bennett established that no attempt was made to calculate the quantity, velocity or area of surface water runoff involved prior to the design and construction of the wall.

All parties agree that at a meeting attended by Torres, Bennett, and Calvin Rogers, Torres agreed to contribute and, in fact, did contribute $354.20 towards construction of the wall. There is substantial dispute, however, whether the wall was constructed as a joint venture, or whether Torres' contribution was a gratuitous act intended to foster a more friendly or neighborly relationship.

■ In view of all the testimony, including the undisputed testimony of Torres that he had, prior to construction of the wall, acquired all the necessary material to continue the chain link fence surrounding his property along the common boundary of Plots 55 and 56, the Court finds as a fact that Torres' contribution was a gratuitous act.

This conclusion is further supported by the testimony of virtually all the witnesses that Torres had no verbal contact with anyone concerning the design or actual construction of the wall before or during its construction; that the cost estimate was made for and given to Bennett; that Calvin Rogers was called to the meeting with Torres and herself by Bennett; that Bennett supplied all water for mixing the cement; that the mason, Hastings Henry, told Bennett when to order materials; that Calvin Rogers had indicated the wall was being built for Bennett; that Bennett wanted the

448

wall for safety; and Bennett's testimony that Calvin Rogers was the contractor who was to hire people to do "everything." Rogers was, in fact, the agent of Bennett for the construction of the wall.

In due course, the wall was constructed. It is clear that Torres watched its construction progress and made no objection to its location. After its completion, a survey was made by Bernard S. Fabio, a licensed surveyor. That survey disclosed for the first time that a substantial portion of the wall had been built upon Torres' plot, with a much smaller segment built upon Bennett's property.

It was further ascertained that a small portion of Bennett's driveway was also located on Torres' property. Again, all parties agree that no one was aware of the misplacement of the wall prior to or during its construction, and that such knowledge was brought to the fore only after the survey had been completed. According to the expert witness, Thomas Phamphile, the wall designed by Calvin Rogers was built correctly, except that the holes in the wall caused damage to Torres' property as a result of the concentrated flow of water through them, and that the wall should have had a trench behind it, that is to say, on its westerly side, to eliminate a build-up of water pressure and to divert the water.

It was his position that the lack of such a trench was the cause of the heavy flow of water through the concrete block wall. He estimated it would cost approximately $1,125 to restore the top soil on Torres' plot to its prior condition, but was unable to estimate with any degree of certainty the cost of labor to spread it.

Of further significance was his testimony that the required trench could be constructed *only* by hand, but he was also unable to estimate its cost.

At a pretrial conference, it was stipulated that the value of the land encroached upon is $350.00. The only testimony

which might have any relevance, and to which the Court has not already alluded, is the testimony of all the workmen that Torres allowed trucks to turn around on his property, allowed cement to be mixed and block to be stored on or near his carport, and that at no time during the course of construction did he make any objection to the construction, location, or design of the wall.

There was some testimony on the part of both parties concerning alleged demands to purchase the lands encroached upon, or alleging offers to purchase such lands, but this testimony is of no significance since no dispute exists as to ownership and control, and all other issues such as consent, acquiescence, and the like have been otherwise determined.

Having now established the basic facts of this matter, it is appropriate to turn our attention to the law.

Bennett was the party who ordered, supervised and controlled the erection of the wall. Torres made no representation as to the location of the common boundary line, nor did either party intentionally cause or allow the erection of the wall to create an encroachment.

Pursuant to the provisions of 1 V.I.C. 4,[1] we must look to the Restatement for an expression of the rules of decision in the Virgin Islands.

Section 892 of the Restatement, Torts provides:

A person of full capacity who freely and without fraud or mistake manifests to another assent to the conduct of the other is not entitled to maintain an action of tort for harm resulting from such conduct.

There was consent to the erection of the wall by Torres, although neither party knew that the wall was mislocated and encroached upon Plot No. 55. Torres raised

---

[1] The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

no objection to its location during construction and granted permission to Bennett's agents to enter upon his lands for the purpose of storing construction materials and the like. Torres, having assented either directly or indirectly by failure to object, is barred to assert a claim for damages arising from the mislocation and resultant encroachment of the wall. Comment (b) of section 892 provides, in part, as follows:

A person manifesting assent to the conduct of another may be mistaken as to the nature of the conduct, the circumstances surrounding it, or its consequences. There may be a mistake as to fact or as to law. *In any case, a person who acts upon a manifestation of assent given by another because of the other's mistake is not liable to the other unless the actor knows or should know that the manifestation is a result of the mistake by the other or unless the other's mistake has been induced by the actor's misleading conduct.* (Emphasis added.)

Clearly, then, whether Torres assented knowing that the wall was being erected on his property, or without such knowledge but under a mutually mistaken belief that the wall was being erected on the common boundary line, Torres is barred from recovery for damages arising out of the resultant encroachment. See also, Restatement, Torts, section 894 and Comment (d) on subsection 1 of section 894, which holds that:

. . . where the means of information are equally open to both parties and this is known to both, *as is true where the location of a boundary line can be determined by a survey, it may be unreasonable* for a neighbor or prospective purchaser to rely wholly upon a statement by the landowners as to the location of his boundary line. (Emphasis added.)

In the case sub judice, no representation as to the location of the boundary line was made by either party, and section 894, therefore, can inure to the benefit of neither party. Comment (e) on subsection 2 provides, in part, that:

... the law will not aid those who choose not to use the means at their disposal to protect their own interests, if the giving of such aid would be at the expense of these who are innocent of intent to commit wrongdoing. This principle frequently operates to prevent a person from claiming property from another who has taken it innocently; its application sometimes also prevents one from claiming that an act was tortious where he did not object to it at the time it was done. Under these conditions silence has the legal effect of a misrepresentation.

Accordingly, the application of section 894 of the Restatement, Torts, establishes the same bar to recovery.

For these reasons, no recovery may be had for damages which are the result of the encroachment of the wall on Plot 55.

The wall, however, may remain as presently located, unless and until it is removed or substantially removed, at which time the equitable easement for its existence shall terminate by operation of law.

Damages resultant from the flow of surface waters, however, are not subject to the same rules of law. Here we are clearly dealing with surface waters which are defined as, "Water(s) diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs, . . . it is distinguishable from water flowing in a fixed channel, so as to constitute a water course, or water collected in an identifiable body, such as a river or lake. The extraordinary overflow of rivers and streams is known as 'flood water.' " Keys v. Romley, 50 Cal. Rprtr. 273, 412 P.2d 529 (Cal. en banc, 1966). See also Restatement, Torts, sections 846 and 841, distinguishing by definition a water course from surface waters.

There are three basic rules governing surface waters which have been, over the years, followed in the United States, subject, however, to an infinite number of variations applied by the respective states.

452

The first rule which appears to have arisen in the states of Massachusetts and New Jersey between 1850 and 1875, is called the "Common Enemy Doctrine." See Town of Union v. Durkes (1875), 38 NJL 21; Keys v. Romley, supra.[2] The second rule governing surface waters is commonly known as the "Civil Law Rule."

The last surface water doctrine is generally known as the "Rule of Reasonable Use." This appears to be the rule which is today accepted in the greatest majority of jurisdictions and more accurately reflects the most equitable division of responsibility between upland owners and downland owners. It carries with it, in addition, insofar as the Virgin Islands are concerned, the added weight of being the rule recited in the Restatement, Torts, about which more will be said infra.

Keys v. Romley, supra, adopts and cites with approval Enderson v. Kelehan (1948), 286 Minn. 163, 32 N.W.2d 286, which authoritatively describes the rule in the following language:

the rule is that in effecting a reasonable use of his land for a legitimate purpose a landowner, acting in good faith, may drain his land of surface waters and cast them as a burden upon the land of another, although such drainage carries with it some waters which would otherwise have never gone that way but would have remained on the land until they were absorbed by the soil or evaporated in the air, if (a) there is a reasonable necessity for such drainage; (b) if reasonable care be taken to avoid unnecessary injury to the land receiving the burden; (c) if the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and (d) if, where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying

---

[2] Braverman v. Eicher, 238 N.W.2d 331 (Iowa 1976); Butler v. Bruno, 341 A.2d 735 (R.I. 1975); Jacobsen v. Pedersen v. Jacobsen, 190 N.W.2d 1 (N.D. 1971); Klutey v. Commonwealth, 428 S.W.2d 766 (Ky. App. 1968); Allen v. Morris Building Co., 103 N.W.2d 491 (Mich. 1960); Rix v. Town of Alamogordo, 42 N.M. 325, 77 P.2d 765 (1938); S. V. Kinyon and R. C. McClure, Interferences with Surface Waters, 24 Minn. Law Rev. 891 (1940).

capacity, or if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted.

Neither counsel for the plaintiff nor the defendant has cited any Virgin Islands case or statute to this Court which deals with the subject at hand, nor has this Court's research disclosed any such reported case or statute. We must turn, therefore, to the Restatement to establish the rule of decision in this jurisdiction. 1 V.I.C. 4.

The Rule of Reasonable Use is recited in the Restatement, Torts, section 822, as follows:

The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if,

(a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and

(b) the invasion is substantial; and

(c) the actor's conduct is a legal cause of the invasion; and

(d) the invasion is either

(i) intentional and unreasonable; or

(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct.

It might seem, therefore, that a determination of whether the invasion by Bennett was intentional or unintentional must be made. This, however, is not so, for section 822 was modified in Tentative Draft No. 17, dated April 26, 1971, approved in principle in Tentative Draft No. 18 by the American Law Institute in May, 1972. "Admittedly, a Tentative Draft is not as persuasive a source of information on 'the rules of common law' as is a draft which has received final approval. But we are satisfied that the weight of authority now lies behind the position in the Tentative Draft of the Second Restatement, rather than that contained in the First Restatement, which dates from 1939." We adopt the position set forth in the Tentative Draft of the Second Restatement. Varlack v. SWC Caribbean, Inc., — F.2d — (3d Cir. 1977).

Section 833 of the Restatement, Torts, provides that "Non-trespassory invasions of a person's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water are governed by the rules stated in sections 822–831." Section 833, as set forth in the Tentative Draft Number 17, reads as follows:

One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either

(a) intentional and unreasonable, or

(b) unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Section 826 of Tentative Draft No. 17 provides that:

An intentional invasion of another's interest in the use and enjoyment of land is unreasonable under the rule stated in § 822, unless the utility of the actor's conduct outweighs the gravity of the harm.

Section 827 sets forth the factors involved in determining the gravity of harm, and in Tentative Draft No. 17, reads as follows:

In determining the gravity of the harm from an intentional invasion of another's interest in the use and enjoyment of land, the following factors are important:

(a) the extent of the harm involved;

(b) the character of the harm involved;

(c) the social value which the law attaches to the type of use or enjoyment invaded;

(d) the suitability of the particular use or enjoyment invaded to the character of the locality;

(e) the burden on the person harmed of avoiding the harm.

Section 828 as set forth in Tentative Draft No. 17 establishes the factors involved in determining the utility of conduct, and reads as follows:

In determining the utility of conduct which causes an intentional invasion of another's interest in the use and enjoyment of land, the following factors are important:

(a) the social value which the law attaches to the primary purpose of the conduct;

(b) the suitability of the conduct to the character of the locality;

(c) whether it is impracticable to prevent or avoid the invasion if the activity is maintained;

(d) whether it is impracticable to maintain the activity if it is required to bear the cost of compensating for the invasion.

The invasion of Torres' interest can certainly be deemed intentional, if not in the initial instance, then certainly as a result of the continuing nature of the invasion.

■ An invasion of another's interest in the use and enjoyment of land is intentional when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct. Restatement, Torts, section 825. It is the knowledge which the actor has at the time he acts or fails to act that determines whether the invasion which results from his conduct is intentional or unintentional, and it is enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing such an invasion.

■ Having already found that the defendant constructed the wall with the alternating open cinder blocks interspersed for the purpose of preventing the wall's destruction by running or accumulating water, under the above stated test, the invasion of the Torres' property is deemed intentional. This particular construction feature of the wall was for the "purpose" of causing the water to flow through the open cinder blocks, in a particular direction and after a particular amount of accumulation, onto plaintiffs' property.

456

■ In the alternative, absent such a purpose, the defendant must have known that the invasion was substantially certain to result from her conduct. Thus the appropriate rules for determining liability, if any, may be those applicable to intentional conduct on the part of defendant. As far as recurring invasions upon the plaintiffs' property *after* plaintiffs first complained about the effect of the wall, such invasions, in light of defendant's conduct (failure to act) would constitute intentional conduct. Restatement, Torts, section 825, Comment (b). The standard is one of reasonableness. Restatement, Torts, section 822(d)(1), and section 822(a) Tentative Draft No. 17.

Of all factors listed in sections 827 and 828 above, it appears that the most significant factor and the one determinative here is that stated in section 828(c). This factor is the subject of Restatement, Torts, section 830:

An intentional invasion of another's interest in the use and enjoyment of land is unreasonable and the actor is liable when the harm is substantial and it would be practicable for the actor to avoid the harm in whole or part, without undue hardship.

■ Knowing the consequence of placing the openings in the wall, as they were placed (slightly above the ground and interspersed along the wall), Bennett could have mitigated the problem by enlarging the openings or placing them at ground level, allowing the direction of the natural flow of surface water and its velocity as it traveled onto plaintiffs' land to be subjected to minimal change. Further, there was expert testimony that a trench of specified dimensions on defendant's side of the wall and at its base would minimize the potential for recurring damage to plaintiffs' property. Under the position of the Restatement, the Court must balance the cost of enjoining the defendant to construct such a trench against the likelihood of and the possible

extent of future damages to plaintiffs' property interest. On balance, it appears that given the defendant's intention in erecting the wall as designed and the certainty of the resulting invasion of plaintiffs' property interest as a direct consequence thereof, and the relatively small cost of such a trench compared to the extent of damage to plaintiffs, that such injunction in addition to accrued damages would be proper. Under the circumstances, the invasion is unreasonable as a matter of law, regardless of defendant's negligence.

Even if the invasion were deemed unintentional, defendant remains liable, for it is said in Comment a. (Page 23) of section 822 of the Restatement (Second), Torts, Tentative Draft No. 17, ". . . private nuisance is solely a matter of tort liability. The interest in the private use and enjoyment of land may be invaded by more than one type of conduct. The invasion may be intentional, and unreasonable. It may be unintentional, but caused by negligent or reckless conduct. . . ." (Emphasis added.)

The design of the wall was formulated without regard to the quantity, velocity or area of surface water runoff involved, and such failure to act in the particular circumstances here present constitutes negligence.

The comment on Clause (b), (Page 29) as set forth in the Tentative Draft, provides that, ". . . although *the rules for determining negligence* and recklessness *are the same in respect to invasions of interests in the use and enjoyment of land as they are in respect to invasions of other interests,* the fact that the actor's conduct involves a risk of harm through the invasion of the interest in the use and enjoyment of land rather than through invasion of some other legally protected interest is often important. . . ." (Emphasis added.)

It is clear, then, from the foregoing that defendant Bennett must be held liable for the invasion of Torres'

interest in his property by the negligent construction of the wall.

Injunctive relief will be granted requiring Bennett, at her own cost and expense, to install and maintain, or cause to be installed and maintained, a trench or ditch on the westerly side of the wall, located as close to the base of said wall as is feasible, and running from its northerly-most point to its southerly-most point, so graded as to carry off the surface waters which are collected in it during rainfall, and for so long as the wall shall remain in its present location. Cf. Hankins v. Borland, 431 P.2d 1007 (Colo. 1967).

In addition to the foregoing, and for the same reasons, plaintiffs shall be entitled to recover for past damages incurred by them, $200 expended for the removal of rocks, "boulders," stones and pebbles, and $1,125 for the installation of top soil to restore the premises to its original state as specified in both the testimony and the estimate of the expert, Thomas Phamphile.

True, the proof of damages was sketchy but, insofar as the $200 item was concerned, was uncontradicted and was limited by plaintiffs' failure to offer proof other than Mrs. Torres' testimony that plaintiffs, "paid over $200" for removing the aforementioned debris.

The award of $1,125 for restoration of top soil, while uncorroborated, is accepted, since it, also, was uncontradicted. Further, the Court has taken into account that that estimate did not include the cost of labor for spreading the top soil, although such a cost would certainly be incurred, and, therefore, as the trier of the facts, determines it to be fair and reasonable compensation for this element of damage.

Judgment shall enter in accordance with this opinion. The formal judgment shall be prepared and submitted, after approval as to form by defendant's counsel.

Unless counsel can agree on the issue of attorneys' fees, appropriate affidavits shall be submitted with the judgment, and any pleadings in opposition shall be filed within 5 days thereafter, or a hearing on the award of attorneys' fees shall be set on motion therefor.