FERGUSON, Justice
(dissenting).
In phrasing the question for review as “whether [Westland’s] construction caused an increase in the amount or a diversion of the surface water flowing onto Machado’s *599 property” the panel overlooks the main point. The question presented, more precisely, is whether the owner of lower elevation land, who erects an eight-foot concrete wall which dams all waters flowing from the upper lands, is liable for resulting flood damages to the property on the adjoining higher elevation land.
FACTS
In 1961 the properties involved in the appeal were in their natural condition as part of the Everglades. Westland’s property was the higher elevation property and surface water naturally flowed to the lower elevation property. In 1970 Machado’s predecessor, Seipp Buick, built a car dealership on the lower land. A putt-putt golf center stood on the upper Westland site. Floods caused damage to the cars on the Buick lot in 1979 and 1980 while the Hialeah Skating Center was being built on the Westland site.
The skating center was built in compliance with the South Florida Building Code adopted by the City of Hialeah. Soakage pits, comprised of subterranean concrete boxes which hold water, and previous grassy areas were utilized to control drainage. After construction the Westland property remained at a higher elevation than the car dealership.
Troubled by problems with rainwater runoff, the owner of Seipp Buick met with the owner of the Westland property to discuss methods of dealing with drainage. No agreement was reached. Subsequently, Seipp constructed a wall eight-feet high and two-feet deep to stop the flow of water from Westland’s property. An engineering firm had advised Seipp of alternative ways to control water runoff such as raising the grade of the property or building dry wells or soakage pits. Seipp decided against those procedures and went ahead with plans to build the wall.
In August 1981, shortly after the wall was built, Westland discovered that its wooden skating floor had more than a thirty percent water content and that the floor was rising. Westland ceased operations and constructed a new floor at a cost of approximately $96,000.
In September, after Westland reopened, surface water accumulated behind Seipp’s wall during a heavy rainfall and flooded the skating center. Westland did not replace the floor again but attempted to repair the damage. Seipp then added the drainage pits and additional fill the engineers had previously recommended. West-land alleged that it was unable to return the skating floor to its pre-flood condition and as a result business declined forcing it to close.
Westland, and its landlord, Hialeah Skating Center, filed an action against Seipp for damages and for a mandatory injunction to remove the wall. Seipp counterclaimed for damages and for an injunction prohibiting Westland from damaging the wall. Gus Machado Buick, Inc. bought Seipp and was substituted as a defendant. At trial the jury returned verdicts for Westland and Hialeah Skating Center against Machado for damages in excess of a million dollars.
In this appeal Machado contends that the court should have instructed the jury in accordance with a “water-as-a-common-enemy” theory which would have permitted a no-liability finding on Westland’s claim.
LAW OF SURFACE WATERS
The common-enemy rule is one of two diametrically opposed rules of law governing interference with the flow of surface waters. Annotation: Modern Status of Rules Governing Interference with the Drainage of Surface Waters, 93 A.L.R.3d 1193 (1979). It holds that a landowner is privileged to protect himself from surface water by any means without liability for the harm that he may inflict on other landowners. Brumley v. Dorner, 78 Fla. 495, 83 So. 912 (1919). The common-enemy rule is based on the principle that a property owner has an unlimited right to use his land as he pleases and its adherents believe that the rule promotes the development and improvement of real estate. Butler v. Bruno, 115 R.I. 264, 341 A.2d 735 (1975).
The second rule, the civil-law rule, provides that because water seeks its own *600 level, naturally flowing from higher to lower ground, the owner of the land on the higher elevation has an easement over the lower elevation land for all water that naturally flows from the higher land. Libby, McNeil & Libby v. Roberts, 110 So.2d 82 (Fla. 2d DCA 1959). The owner of the lower land is not entitled to block the natural flow of surface water onto his land. Roberts. Nor is the owner of the higher land entitled to increase or divert the natural flow of the water onto the lower land. New Homes of Pensacola, Inc. v. Mayne, 169 So.2d 345 (Fla. 1st DCA 1964). Under the civil-law rule a “person who interferes with the natural flow of surface water so as to cause an invasion of another’s interests in the use and enjoyment of his land is subject to liability to the other.” Kinyon & McClure, Interferences with Surface Waters, 24 Minn.L.Rev. 891, 893 (1940).
Critics of the civil-law rule posit that strict application of the rule inhibits landowners from improving their land for fear that any improvement to the land is likely to change the material flow of surface waters, thereby creating liability for the altered flow onto the neighbor’s land. Atchison, Topeka & Santa Fe Ry. v. Taylor, 87 F.Supp. 313 (E.D.Mo.1949).
Hard cases and increasing urbanization led modern courts to adopt exceptions and modifications of the original rules. Brumley, 78 Fla. at 501, 83 So. at 914. Thus, a general exception to the civil-law rule developed for urban areas. Under the urban modification of the civil-law rule, a landowner is privileged to improve his land without liability for altered water flow provided that the improving landowner has not been negligent. E.g., Young v. Huffman, 77 S.D. 254, 90 N.W.2d 401 (1958). The reasonable-use theory, in accordance with modem land use philosophy, acknowledges the right of a landowner to make beneficial use of his property, subject to a reasonableness limitation. Accordingly, a landowner may alter the natural flow of surface waters even where the alteration causes damage to a neighbor’s land so long as the harmful alteration is tolerable. Whether a landowner has acted reasonably or unreasonably is a question of fact to be determined on a case by case basis. Factors to be considered in determining reasonableness are the foreseeability of the harm, the extent of the harm, and the purpose and nature of the alteration. Armstrong v. Francis Corp., 20 N.J. 320, 120 A.2d 4 (1956) (Supreme Court of New Jersey adopting the reasonable-use rule because of its particular flexibility). See generally Kinyon & McClure, Interferences with Surface Waters, 24 Minn.L.Rev. 891 (1940).
“The reasonable-use rule rejects the extreme doctrines of both the civil-law and common-enemy rules, recognizing that the situation of all adjoining owners of land is not the same, and as the circumstances attending the use of the land in view of the flow of surface water are infinitely various, the failure to obtain substantial justice by the enforcement in all cases of a rule of law which does not recognize these important differences is not surprising.”
Franklin v. Durgee, 71 N.H. 186, 191, 51 A. 911, 913 (1901).
The Supreme Court of South Dakota, noting that it was following the modern trend of authorities, expressly adopted the reasonable-use rule regarding surface water drainage in urban areas. The court stated in Mulder v. Tague, 85 S.D. 544, 186 N.W.2d 884 (1971), that the reason for the civil-law rule disappears in areas where adequate artificial drains and storm sewers are provided. See also Butler, 115 R.I. at 264, 341 A.2d at 735 (Supreme Court of Rhode Island adopting reasonable-use rule because it does not hamper land development, permits an equitable allocation of development costs, and is flexible).
In also adopting the reasonable-use rule the Supreme Court of New Hampshire described the disadvantage of the common-enemy rule:
If the owner of land has absolute and unlimited domain thereof, wholly independent and irrespective of his neighbor’s enjoyment of their contiguous lands, he may with impunity wholly pre *601 vent the natural flow of surface water upon his land, and cause it to flow back upon the adjacent owner’s land by means of an enbankment or other obstruction erected upon the division line; and he would be entitled to thus inflict immense damage upon other’s property, not because he might derive some advantage from the operation or because it is a reasonably necessary method of developing and improving his land, but merely because the land is his.
Franklin, 51 A. at 911.
Modern Florida courts have generally adhered to a modified civil-law or reasonable-use rule. See Seminole County v. Mertz, 415 So.2d 1286 (Fla. 5th DCA) (citing F. Moloney, S. Plager, R. Ausness, B. Canter, Florida Water Law 617 (1980)), rev. denied, 424 So.2d 763 (1982). Under Florida law the owner of higher elevation land may improve the natural drainage of his land providing he acts reasonably and does not divert the flow. Id. The Supreme Court of Florida referred to the civil-law and common-enemy rules saying that both “rules have been considerably modified by the courts, and it seems to be the almost unanimous verdict of the courts that each case must stand upon its own facts.... ” Brumley, 78 Fla. at 501, 83 So. at 914. The reasonable-use rule involves a shift away from the traditional property law concepts of land rights and servitude and focuses on tort issues of liability and damages. R. Cunningham, W. Stoebuck, D. Whitman, The Law of Property § 7.6 (1984).
JURY INSTRUCTION
Consistent with tort concepts the jury was instructed as follows:
1. That higher elevation land imposes a servitude on the owner of neighboring lower elevation land to accept the runoff of water naturally flowing from the higher elevation to the lower.
2. That the owner of higher elevation land has a right to use and improve his land by constructing a building on his property in accordance with applicable building code requirements.
3. That if the higher elevation owner complies with the applicable building code, and rain water then falls onto the building constructed on the higher elevation land, and from that building onto the lower elevation land, a servitude on the lower elevation land owner is still imposed as it is for naturally flowing water.
4. That the owner of lower elevation land may not lawfully construct a barrier between its land and the adjoining higher elevation land for the purpose, in whole or in part, of preventing water flowing from the higher elevation land to flow to the lower unless:
(a) The owner of the higher elevation land grants permission for the barrier constructed by the lower elevation land owner; or
(b) The building on the higher elevation was not constructed in accordance with applicable building code requirements which deviations from code cause the natural water flow to be increased or made more burdensome; or
(c) The barrier built by the lower land owner provides adequate drainage to protect the higher elevation land owner from flood.
In fashioning a jury instruction the court clearly and correctly rejected both absolute principles represented by the civil-law and common-enemy rules regarding surface waters. Instead the court instructed the jury, in accordance with the reasonable-use rule, that the law imposes a duty on the part of both the higher and lower level landowners to refrain from such interference with the natural flow of surface water as would unreasonably cause harm to the adjoining land.
The test applied where a jury instruction is challenged for fairness is whether the instruction, considered in totality, was so misleading or confusing that it caused the *602 jury to arrive at a conclusion it otherwise may not have reached. Finch v. State, 116 Fla. 437, 156 So. 489 (1934); Veliz v. American Hospital, Inc., 414 So.2d 226 (Fla.3d DCA), rev. denied, 424 So.2d 760 (1982); Webb v. Priest, 413 So.2d 43 (Fla.3d DCA 1982). That is not the case here.[1] For that reason it cannot be said that the jury instruction caused a result which otherwise would not have been attained. Subpara-graph 4(c) allowed the jury to find no liability if Machado’s course of action to protect the lower land was reasonable under the circumstances. There was uncontroverted evidence presented at trial that more reasonable methods were available to Macha-do to protect its lower land against any increase in surface water runoff caused by Westland’s improvements to the upper land.
CONCLUSION
Only an instruction in accordance with the outdated common-enemy rule would have allowed the jury to find Machado not liable for damages caused to Westland’s upper lands by the damming of all waters flowing to the lower land — including naturally flowing waters. Such an instruction would have been the equivalent of a directed verdict for Machado. There is no disagreement, however, that Florida does not follow the common-enemy rule. For that reason it cannot be said that the jury instruction based on a modified civil-law or reasonable-use rule was erroneous. Flooding on Westland’s upper lands, with the potential for immense damage, was a foreseeable consequence of building an eight-foot concrete wall on Machado’s lower land for the purpose of halting the natural flow of surface waters. See W. Prosser, Torts § 89 (4th ed. 1971).
The judgment entered on the jury verdict should be affirmed.
SCHWARTZ, C.J., and DANIEL S. PEARSON, J., concur.

. The majority is correct in stating that the instruction would have been wrong if it determined that Westland’s use of its property was reasonable as a matter of law simply because improvements were made in accordance with the applicable building code. Majority opinion n. 2. First, that instruction was relevant only to Machado’s counterclaim against Westland. More significantly, the instruction did not amount to a directed verdict against Machado on its counterclaim since a failure of Westland to comply with the Building Code, if so found, was only one of several factors which would have justified actions by Machado to protect its property from surface waters flowing from the upper land. The issue of the reasonableness of the action taken was still a jury question.