[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is a civil action between the owners of abutting parcels of land in the Town of Tiverton. The plaintiffs are partners who own approximately 24 acres lying easterly of Highland Road, which they have begun to develop as house lots in a plat called "Highland Estates." The defendant owns approximately 170 acres abutting the southern boundary of the plaintiffs' land. There has been a mill pond on the defendant's land for a long time.
The plaintiffs contend that in November 1988 the defendant caused the mill pond to overflow a portion of their land and that he continues to allow the mill pond to flood a critical portion of their development. They seek damages and injunctive relief on the ground that the defendant's conduct is a continuing nuisance. The defendant argues that he has an ancient right to dam the stream which flows through both their properties and that he has a prescriptive right to cause the mill pond to overflow the plaintiffs' land. He also argues that the flooding of the plaintiffs' land is a consequence of local rainfall and is not caused or affected by his dam.
Sin and Flesh Brook and Archer Brook flow into one another on the plaintiffs' land and the resultant stream, also called Sin and Flesh Brook, flows southerly into the defendant's land. Sometime in the middle of the nineteenth century one Rodman constructed a dam across Sin and Flesh Brook on the defendant's land and thereby created a pond from which he and his successors harvested ice until sometime in the early 1930's. The dam itself consists of earth abutments along the southern limit of the pond with a weir gate or sluiceway which permits overflow from the pond to flow through a stream called the Gut out to the east passage of Narragansett Bay. The gate is a concrete base with a downstream sloping apron with concrete sidewalls. The height of the water on the pond side of the dam above the level of the concrete base is controlled by stop-boards which extend across the entire pond side of the dam or gate and which are supported by four upright timbers on the downstream side of the stop-boards. The stop-boards are not fastened to the walls of the gate or the uprights but depend on the weight of the withheld water to hold them in position. Each of these boards is twelve feet long, five inches broad (high when held against the uprights, wide when afloat) and one and three-quarters inches thick (deep when afloat). The defendant repaired the gate or dam in 1986 by replacing some of the mortar and the four timber uprights. He variously testified that there were five or seven boards in the gate at material times.
The controversy in this case arises out of the northernmost extent of the mill-pond. There is credible evidence that many years ago the ill-defined northern limit of the pond extended from time to time into what is now the plaintiffs' land. There is no evidence, however, as to the number of horizontal stop-boards then in place across the pond-side face of the wair gate, not is the evidence clear-cut as to how far and how long this overflow took place. There is credible evidence that through the years the size and height of the pond has varied with a resulting overflow and drying out of the plaintiffs' land near the juncture of the two streams and the boundary between the parties' land.
The defendant has presented an extensive case, mostly anecdotal, to establish that the size of the pond, and the consequential overflow of the plaintiffs' land, is controlled by local rainfall. He argues that, when there is plenty of rain, the plaintiffs' land is flooded, but when there is a drought, the plaintiffs' land dries out. The plaintiffs have presented credible expert testimony, which the Court finds reasonable, that the size of the pond is directly related to and controlled by the number of horizontal stop-boards across the face of the gate.
It is undisputed that the gate is under the sole and exclusive control of the defendant. The defendant has the ability to control the height of the water in the pond and, consequently, the size of the pond and its overflow onto the plaintiffs' land. Local rainfall, of course, affects the volume of water feeding into the pond, but the volume of water flowing out of the pond is directly controlled by the height of the stop-boards in the dam gate. That height is directly controlled by the defendant.
The defendant argues, and did present some evidence, again anecdotal, that the total height of the stop-boards is self-regulating. He contends that the 5-inch wide stop-boards fall away from the face of the dam as the water level in the pond drops as inflow is reduced. But, he says, as the inflow is increased so the the level of the pond rises, the boards float into an upright position one above the other broad-side against the timbers. Thereby, the gate is raised naturally, so to speak. No scientific, hydrodynamic evidence is offered to account for this remarkable phenomenon. Maybe it happens; maybe it doesn't. Nothing prevents the defendant from removing a board or two when this occurs to avoid the plaintiffs' land from being flooded. In any event, the Court accepts the testimony of the plaintiffs' expert, Russell F. Geiser, that the phenomenon described by the defendant could not occur. His conclusion was that the likeliest consequence of a stop-board's falling away from the dam and the pond's thereafter rising significantly would be that the board would float over the dam into the spillway on the downstream side of the dam.
The plaintiffs have presented evidence in the nature of aerial photographs, drawings and sketches, and point to a drawing furnished by the defendant himself, all of which shows that for over twenty-five years before 1988 the northern rim of the pond lay between 100 and 200 feet south of the boundary between the parties' land. The defendant vigorously opposed the admission of these photographs, but the Court was satisfied and continues to be satisfied that these aerial photographs are admissible as exceptions to the rule against hearsay under Rule 803(8). While ordinarily interpretation of aerial photographs requires expert assistance, these photographs are sufficiently clear that even a lay person can make intelligent observations and draw reasonable inferences. The photographs plainly show the boundary between the parties' land, because the defendant has carefully maintained his property as a meadow, or hayfield, while the plaintiffs' land was overgrown at the time of the photography. The pond stands out in dark contrast to the bright reflections from the defendant's fields and the plaintiffs' predecessors' overgrowth. What has caused long reflection by this Court is that the defendant's land in the area of the inlet feeders to his pond is as uncultivated as his nearby fields are neatly groomed. The Court concludes that these areas are not mowed because the tendency of the feeder streams to overflow their banks makes this area unsuitable from time to time for growing hay. The Court finds that at least since the early 1960's until November 1988 the northern limit of the defendant's pond was at least one hundred feet south of the plaintiffs' land.
The inevitable conclusion from all of the foregoing analysis is that the unexplained rise of the pond and the overflowing of the plaintiffs' land in November 1988 was directly caused by the defendant's exercise of control over the level of his mill pond at the dam. The Court finds that the defendant knew he could cause the plaintiffs' land to be flooded and that he knowingly and intentionally either placed the stop-boards or caused them to be placed across the dam in order to flood a portion of the plaintiffs' land. The Court further finds that the defendant knew that the stop-boards across the pond side of the dam were causing the flooding of the plaintiffs' land and he did not remove any boards to relieve the overflow onto the plaintiffs' land.
The defendant claims he has a prescriptive right to dam the stream flowing across his property in such a way that the backed up reservoir, or mill pond, overflows the land of the plaintiffs. The defendant points to evidence that for many years, when ice was cut from the pond, the pond openly and adversely to any contrary claim of abutting owners overflowed the land now owned by the plaintiffs. This Court finds, nevertheless, that even if at some time in the past the defendant, or his predecessors in title did openly, notoriously and adversely overflow the land now belonging to the plaintiffs, there is no competent, credible evidence that they did so continuously for whatever period was then necessary to acquire an easement by prescription. Furthermore, considering that the Court finds that the defendant has not exercised any such right during at least the twenty-five-year period prior to November 1988, any such right has long since been abandoned by knowing and intentional non-use, if it ever existed.
The defendant does not cut ice from his mill pond, nor does he use the energy of the dammed-up water to drive machinery. He uses the pond to water his grazing livestock at its bank. He provided no evidence as to what size pond he reasonably requires to provide liquid refreshment to his animals.
The case of Butler v. Bruno, 115 R.I. 264, 341 A.2d 735, 93 A.L.R.3d 1183 (1975), cited by the plaintiffs, does not, of course, deal with the respective rights of riparian owners, but addresses only the rights of landowners with regard to the flow of surface water. In that case our Supreme Court adopted for Rhode Island the "reasonable use" rule. The focus of decision under that rule is shifted from an analysis of the actor's conduct to the consequences of his or her acts on the land of those affected by the conduct. Under the rule courts are to consider such factors as the reasonable necessity for the actor's conduct, the degree of care taken to avoid injury to others, whether the benefit of the conduct outweighs the harm caused and whether the conduct has improved any natural or normal drainage system or whether any artificial system installed is reasonable and feasible.
While that case dealt with the defense of privilege to the tort of nuisance in draining surface water over an adjoining landowner's property, its rationale is helpful in deciding whether the defendant's conduct is tortious or whether he enjoys some implied privilege to back flowing water onto the plaintiffs' land.
The defendant undoubtedly has a right incident to his ownership of his land to collect a pond on his land, using artificial means as necessary. Subject to negligence rules, he can maintain that pond at such a size and depth as he wishes. His pond may overflow the land of others, however, only by consent, implied or express, or by some right established under law. There is no evidence whatever that the defendant has any right by grant or consent, express or implied, to allow his pond to overflow the plaintiffs' land. Since he has not proved that he had acquired an easement by prescription, he is guilty of a continuing unprivileged nuisance. Citizens for Preservation of WatermanLake v. Davis, 420 A.2d 53, 59 (R.I. 1980).
The classic award of damages would be the money value of the plaintiffs' loss of the use and enjoyment of their land. The plaintiffs claim that their damages include the monthly payments they have made to a lender on a mortgage. The mortgage installment payments are in part reduction of principal and in part interest. Under those circumstances, they cannot be the basis for an award of damages, since it is not clear how much delay in payment of the loan was caused by the defendant, and so, the Court cannot compute how much unnecessary interest the plaintiffs were required to pay. The plaintiffs have proved, however, that they were required to incur expenses in the amount of $6,926.96 as a direct consequence of the nuisance created by the defendant. The plaintiffs are not entitled to counsel fees in the absence of any specific statutory provision.
The plaintiffs will have a judgment against the defendant granting the following relief:
1. Money damages in the amount of $6,926.96, plus interest and costs.
2. A permanent injunction, enjoining the defendant from causing or allowing the water in his pond to overflow the plaintiffs' land.
3. A permanent mandatory injunction commanding the defendant to remove the stop-boards in the face of his dam until all the water overflowing the plaintiffs' land recedes from their land.
The plaintiffs will present a form of judgment for entry upon notice to the defendant.