March 22, 2019

**Supreme Court**

No. 2017-153-Appeal.
(PC 10-290)

Maria Silva et al.                    :

              v.                      :

Shawn Laverty et al.                  :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Maria Silva et al.                    :

v.                    :

Shawn Laverty et al.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The plaintiffs, Manuel Silva and Maria Silva, have

appealed from a final judgment entered on April 9, 2018 in Providence County Superior Court in

favor of the defendants, Jessica Laverty[1] and Shawn Laverty.  That judgment was entered

following a three-day bench trial in August and September of 2016 and the rendering of a bench

decision on November 30, 2016 in the defendants' favor.  On appeal, the plaintiffs contend that

the trial justice erred because: (1) he overlooked and misconstrued material evidence in

determining that the Lavertys owed no duty to the Silvas with respect to their negligence claim

and also in determining that the Silvas had not proven a breach of such alleged duty; (2) he

improperly determined that the Silvas had not shown causation and damages with respect to the

nuisance and negligence claims; and (3) he misapplied the "rule of reasonable use" to the facts of

---

[1]      Jessica Todd was married in April of 2011 and thereafter changed her name to Jessica
Laverty.  At the time of the filing of the complaint (January 15, 2010), she still referred to herself
as "Jessica Todd," hence the disparity between her present proper name and the case caption.
For the sake of consistency, we shall refer to her by her married name, "Jessica Laverty."

1

this case in light of the factors set forth in *Butler v. Bruno*, 115 R.I. 264, 273-74, 341 A.2d 735, 740 (1975).

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel [2]

The parties agree that, as of 1951, all the land now owned by both parties to this action (said land being located in Cumberland, Rhode Island) was owned by Gerard Tanguay and his then-wife, Giselle. Gerard later conveyed one parcel of that land to his son, Richard Tanguay, and Richard's wife, Carole Tanguay.[3] A separate parcel of Gerard Tanguay's land was conveyed to a trust whose named trustees were Gerard and his second wife, Janet Tanguay. The parties additionally agree that Richard and Carole Tanguay submitted a site plan to the Rhode Island Department of Environmental Management (DEM), proposing the installation of the underground pipe that lies at the core of the dispute between the parties; that pipe runs from a catch basin on the property then owned by Richard and Carole Tanguay (and now owned by defendants) downhill to the property then owned by Gerard Tanguay (and now owned by plaintiffs). The site plan was approved by DEM in May of 1987. The defendants in this case

---

[2]    Since this case can be resolved solely by evaluating the trial justice's determination that plaintiffs failed to prove that they suffered actionable harm attributable to the underground pipe at issue, we shall relate only the facts necessary to analyze that conclusion. However, even bearing in mind the narrowness of the legal issue that we shall address, we have found it necessary to sketch the factual background in considerable detail.

[3]    Due to the fact that so many of the persons involved in this case (a case whose factual complexity brings the novels of Tolstoy to mind) share common last names, we shall often use full names so as to avoid confusion.

2

purchased the property at 180 Roland Street from Carole Tanguay in 2009[4] ("the Laverty property"). In 2005, Janet Tanguay conveyed her property at 3 Blissdale Avenue to plaintiffs ("the Silva property").[5] The plaintiffs' essential contention is that the pipe empties water from the Laverty property onto a portion of the Silva property in such a way that the flow of water from the pipe is actionable as a matter of both negligence and nuisance law.

We shall next summarize the portions of the trial record relevant to issues about which the parties do not agree.

## A

### The Plaintiffs' Witnesses

### 1. The Testimony of Maria Silva

Maria Silva testified that, before purchasing what is now the Silva property at 3 Blissdale Avenue on April 29, 2005, she visited the property more than once and that her husband, Manuel Silva, did so once.[6] She adhered to that testimony when she answered affirmatively to counsel's question: "[B]efore you purchased this property, did you walk the land?"

Mrs. Silva further testified that, before the purchase, she did not see any water present on the portion of the property that is in dispute and that neither the realtor nor the previous owner told her about water accumulation or the existence of a wetland on the property. She agreed upon cross-examination that the Purchase and Sale Agreement for the property specifically

---

[4]    Richard Tanguay died after he and Carole Tanguay built a house on their property, which is now the Laverty property.

[5]    It is uncontested that the Silva property abuts the Laverty property and is situated *downhill* from it.

[6]    Manuel Silva also testified at trial and similarly stated that he had visited the Silva property one time before the purchase took place.

indicated that a wetlands inspection should be conducted and that she had never had such an inspection done.

Mrs. Silva testified that the accumulation of water on the particular portion of the Silva property at issue became the subject of attention "[a]round September of 2005 * * *." (She stated that, in or around September of 2005, "there was rain, like we had rain for a few days and then we had a major rainstorm," and she said that that storm led to "major flooding.") Mrs. Silva agreed that that portion of the Silva property is located "at the corner of defendants' property."

Mrs. Silva further testified that, when she first noticed the pipe from which water was flowing onto her property in the September 2005 time frame, she called the Cumberland Fire Department, whose personnel "cleaned up an area so the water would drain more * * *." She added that someone from the Fire Department "said it's coming from this area here and you could actually see [the pipe]." She agreed at trial that the pipe is clearly visible. Mrs. Silva testified that, when she discovered the pipe, she "tried to contact everyone and anyone in the town hall trying to find out where was that [water] coming from * * *." Mrs. Silva further testified that the portion of her property onto which the water from the pipe flows periodically experiences water accumulation. She elaborated: "Only, you know, when we really get major storms, that wherever the water comes from, it starts gushing onto the property."

Mrs. Silva stated that, at some point in time after she first discovered the pipe on the property, she contacted Scott Rabideau, a wetlands scientist, who came out to observe the Silva property "once [or] twice." Thereafter, the Silvas received a letter from Mr. Rabideau's office stating that "a small forested/shrub wetland is present" on their property. Both Mr. and Mrs. Silva testified that, since purchasing the property, they have been unable to use that portion of

the property that contains the wetland. Maria Silva also expressly acknowledged that they have not applied to DEM to alter that portion.

Mrs. Silva testified that she learned that Carole Tanguay (the eventual grantor to the Lavertys) then owned the property from which the pipe carried water downhill onto the Silva property. She added that, on June 24, 2009, the attorney representing her and her husband sent a certified letter to Carole Tanguay "notif[ying] her of the pipe that was projecting from her property onto [the Silva property] * * * and ask[ing] her to take the necessary steps to correct it * * *." Mrs. Silva testified that she later "happened to drive by [Carole Tanguay's property]" and, at that time, she "saw a for sale sign." She added that, when she and her husband learned that defendants were "the new owners" of the uphill property, the same attorney sent the Lavertys a letter on September 29, 2009, enclosing therewith the above-referenced June 24, 2009 letter.

### 2. The Testimony of Carole Tanguay

Carole Tanguay, the previous owner of what became the Laverty property, was shown by plaintiffs' counsel recent photographs of the Silva property, and she said that she recognized the area but that she "never saw this much water" and that there was substantially more water depicted in the photographs than she had ever observed. She also acknowledged her signature on a certified letter regarding the water discharge issue that plaintiffs' counsel had sent to her in June of 2009, but she added that she did not remember receiving the letter or signing for it.

### 3. The Testimony of Brandon Faneuf

Brandon Faneuf, an expert called by the Silvas who described himself as a "[w]etlands scientist," testified that he first took a view of the Silva property in April of 2013 and did so again on one later occasion. It was his opinion that there were several indicators of the presence of a wetland, including an "impounded area," which he defined as being "[a]n area where water

5

is standing." He further explained that such an area "doesn't so much have observable flow as it's just standing" and has "wetland plants" that indicate "a hydrophytic condition, which means that more likely than not there is water near the surface * * *." When asked to describe "the flow of the water" onto the Silva property, he said: "The water starts at the pipe we've been talking about. It flows downhill into the impounded area * * *."

Mr. Faneuf opined that "[t]he discharge of water from the subject pipe exacerbates the amount of water entering the Silvas' property;" and he added that, "[i]f there was no pipe present discharging water, that area would be dryer." When asked by the trial justice if he could determine to a reasonable degree of scientific certainty how much wetter the portion of the Silva property at issue was because of the flow from the pipe, Mr. Faneuf said: "It all depends * * *. I'll say from my professional opinion is that during springtime and after the snow melts, rain events, there can be significant amounts of water flowing into that area enough to exceed the limits of the impoundment area * * *." Mr. Faneuf responded affirmatively when asked on cross-examination: "So you have indicated that there's a preexisting wetlands on the Silvas' property, correct?" The following exchange then ensued:

> "[COUNSEL FOR DEFENDANTS:] And it's your opinion that, at least your affidavit indicates, that the preexisting – that the pipe exacerbates that condition; is that right?
>
> "[MR. FANEUF:] Yes.
>
> "[COUNSEL FOR DEFENDANTS:] But * * * basically what your affidavit says is you cannot tell the extent to which the preexisting wetland is exacerbated by the discharge of water from the pipe; is that right?
>
> "[MR. FANEUF:] That is right, and what I read here in the affidavit is that * * * 'this underground pipe is certainly emitting and delivering additional water onto the Silva property although I'm unable to quantify to what degree * * *.' I'm unable to

6

quantify in terms of volume. That's not my training, that's not my background.

"[COUNSEL FOR DEFENDANTS:]    Fair enough. And you haven't determined whether the wetland has expanded laterally as a result of the discharge of water onto the property, is that right?

"[MR. FANEUF:]    Correct."

Mr. Faneuf further stated: "I have not determined whether or not the wetland has extended laterally in width." As indicated above, when the trial justice inquired of Mr. Faneuf whether the wetland area on the Silva property was expanding because of the flow from the pipe, he responded: "I'm unable to quantify in terms of volume. That's not my training, that's not my background." He further testified:

"The inherent problem with that is the pipe has been there for much longer than when I first arrived on the scene in 2013. So for me to definitively tell you what the lateral extent of change was is very difficult, but I just wasn't around to see the preexisting condition. So it makes it very difficult on my part to give you, say, five feet, ten feet. It's very difficult to say. All I can say is that when you add water to an existing system, it can extend the lateral extent of the impounded water."

### 4. The Testimony of Norman Beretta

The plaintiffs also called as an expert one Norman Beretta, a real estate appraiser. He testified that he had viewed the Silva property "[p]robably four times, at least." Mr. Beretta testified that he was asked to look at a portion of the land that was "27,000 square feet." He opined that the fair market value of that portion was "$75,000," under the assumption that that portion of land was buildable. However, he further testified that he later performed an "addendum appraisal" and that he did so "under the assumption that [that portion of the property] is rendered unbuildable by the discharge of water from the pipe that exists on the lot * * *." He responded affirmatively when plaintiffs' counsel asked: "[U]nder the buildable – your so-called

7

buildable lot situation, then you have this property having a value of $75,000, and under the application of the diminution in value facts, then you have it having a value of $8,000?" He also testified that, if one took out that portion of the lot (which he believed had been rendered unbuildable because of the impact of the flow from the pipe), "you still end up with – it would be a legal lot."

**B**

**The Defendants' Witnesses**

**1. The Testimony of Shawn and Jessica Laverty**

Shawn and Jessica Laverty testified that they purchased their property in August of 2009 from Carole Tanguay, that the pipe had been installed on their property before they purchased it, that DEM had approved the pipe before it was installed, and that they had made no changes to the pipe. Shawn Laverty testified that they first became aware of the pipe in September of 2009, upon receipt of the letter from plaintiffs' attorney. Jessica Laverty testified that she had not seen the letter about the pipe that plaintiffs' attorney sent to Carole Tanguay before Carole Tanguay sold the property to the Lavertys.

**2. The Testimony of Janet Tanguay**

Janet Tanguay testified that she formerly owned and lived at the property which is now the Silva property and which she said is at the bottom of a hill. Mrs. Tanguay testified that there had always been water problems on the portion of the property that is at issue in this case. She additionally testified that, before she sold the property to plaintiffs in 2005, they had come to inspect the property. Mrs. Tanguay agreed that she "might have" told a real estate agent involved in the transaction that there were wetlands on the property.

### 3. The Testimony of Robert Tanguay

Robert Tanguay[7] testified that since 1947 he has lived at 160 Roland Street (a site distinct from the properties at issue), which is "two house lots up" from the Laverty property. He testified that Gerard Tanguay (his brother) was the prior owner of both the Laverty property and the Silva property, and he said that Richard Tanguay was his nephew. He additionally testified that he was present when Richard was constructing the house on what would eventually become the Laverty property. He testified that Richard installed the pipe because DEM had "made him put that pipe in" due to the fact that, as a result of his elevating his land during the construction, "a neighbor * * * was getting flooded." He further testified that the pipe was installed in order to manage the surface water on what is now the Laverty property.

Robert Tanguay stated that there had been water on what is now the Silva property "[f]orever." He further testified that, during his childhood, there had been sufficient water accumulation on said property that one could "skate in the winter, when I was a kid, on that little pond in there." He recalled: "Gerry's pond we used to call it." When asked if, before the installation of the pipe in 1987, he had referred to the area in question as a "pond," he responded: "Oh, definitely, yes." He continued: "It's wetlands. It always was." He also testified that he had seen an accumulation of water on that area being as extensive as it was depicted in the photographs shown to other witnesses. Robert Tanguay also testified that, while there are times of the year when the area is "somewhat" dry, even then it is "still muddy."

---

[7] Robert and James Tanguay (father and son respectively) were dismissed without prejudice from this action during the trial, having originally been named by defendants as third-party defendants.

## 4. The Testimony of Scott Rabideau

The defendants called as an expert witness one Scott Rabideau, who testified that his "expertise has always been as a wetland biologist, a wildlife biologist, or a coastal biologist and a permitting specialist." Mr. Rabideau testified that he had at an earlier time been engaged by plaintiffs and that he has been to the Silva property at least six times. He also acknowledged that DEM has never officially determined that there is any wetland on the Silva property. He testified that, in order to determine whether a wetland is present on property, experts look to "whether or not the area is inundated or saturated with surface or groundwater and whether or not the area has a prevalence of wetland indicator plant species." He stated that "[i]t would not be uncommon for a wetland to be dry." He said that, to qualify as a wetland, the ground "needs to be only saturated so the groundwater is at or near the surface and there never has to be standing water in certain wetlands."

Mr. Rabideau testified that he had reviewed aerial photographs of the Silva property, which were "dated 1939, 1951, 1972, 1981, 1988, 1997, 2003, 2008 and 2011." He stated that examining aerial photographs to "provide a historic perspective" constitutes a "normal part of any evaluation of a freshwater wetland." He testified to the following as his opinion:

> "[T]here is a freshwater wetland on [the Silva property]. It is a freshwater wetland that is less than three acres in size. It is regulated by the Department of Environmental Management, and based on a review of the historic aerial photographs, it hasn't changed in terms of its lateral size over the course of 1972 to 2011."

Mr. Rabideau responded affirmatively when asked: "So is it your opinion that there was a wetland in existence before the pipe was installed at [the Laverty property]?" He likewise responded affirmatively when asked: "And if that pipe is removed, will there continue to be a wetland on [the Silva property]?" He continued:

10

> "[T]here's going to be a change in the duration and frequency of flooding. * * *

> "If that pipe is eliminated, capped, that flow is going to back up. * * * [I]t's going to pop out of that catch basin and it's still going to run down to this wetland across the property. It's still going to get to that wetland. So the duration is going to take longer to fill up but you're still going to get the same amount of water. The groundwater is going to discharge and travel downhill to that wetland."

Mr. Rabideau testified that a landowner can alter (*i.e.*, build on top of) a wetland, but he added that such a landowner must apply to DEM before beginning that process. When asked about the Silva property specifically and whether, in his opinion, DEM would likely grant a permit to build on the portion of the land that is allegedly impacted by the water from the pipe, he stated: "[A] home could be constructed in those areas and you would never have to fill the flooded area." He testified that, because there is a second pipe that drains the water *from* the wetland on the Silva property, which second pipe is equal in size and downhill from the pipe that runs from the Laverty property, "there is a sufficient pitch across the property so that the water, to make it simple, flows downhill through the property and out to the pipe. * * * [s]o it allows the water to get out off the site."

## C

### The Trial Justice's Decision

After the three-day bench trial and after the submission of post-trial memoranda,[8] on November 30, 2016, the trial justice issued a bench decision that was favorable to defendants. He summarized the essence of his decision as follows:

---

[8]    During the course of the trial, the trial justice had allowed plaintiffs to amend the complaint (which originally alleged liability only under a negligence theory) to include a count alleging nuisance.

11

> "*The fatal flaw in plaintiffs' claim is that they failed to prove harm.* The evidence is insufficient to establish that plaintiffs' property is any worse off because of the installation of the pipe in question. The only evidence that plaintiffs provided regarding the effect of the installation of the catch basin and drainage pipe was from Mr. Faneuf." (Emphasis added.)

In addition, with respect to the testimony of Mr. Faneuf, the trial justice stated:

> "He did testify that[,] in his opinion, the property was wetter after the pipe was installed but he could not quantify how much wetter. * * * He could not quantify how much the pipe increased the wetland. Mr. Faneuf's testimony was flawed. If he was of the opinion that the drainage pipe made the property wetter, then he should be able to determine the wetness or condition of the property prior to the installation of the pipe. Otherwise, how else could he possibly conclude that the property is wetter. If he can't say how much wetter the property is, then he can't know the condition of the property prior to the installation of the pipe. And if he can't determine the condition of the property prior to the pipe installation, then he can't say it was wetter. It appears that Mr. Faneuf's testimony, in the Court's opinion, was based on conjecture."

In stark contrast, the trial justice specifically stated that he "found Mr. Rabideau [defendants' expert] to be a credible and a thorough witness." He specifically stated:

> "*It is this Court's opinion that Mr. Rabideau's testimony was much more concrete and credible.* He was able to definitively state that the wetland had not increased in size after the installation of the pipe based on an analysis of the aerial photos. His testimony was consistent with historical facts provided by the witnesses, especially Robert Tanguay, who had lived in the area since 1947." (Emphasis added.)

In clear and cogent language, the trial justice then expressly held as follows:

---

In the course of his comprehensive and cogent bench decision, the trial justice stated that he did "not believe that the negligence theory is applicable to the facts and circumstances of this case." In view of our holding (*see infra*) that plaintiffs' case is fatally flawed under both a negligence theory and a nuisance theory, we need not and therefore do not pass upon the just quoted statement of the trial justice. *See Grady v. Narragansett Electric Co.*, 962 A.2d 34, 42 n.4 (R.I. 2009) (referring to "our usual policy of not opining with respect to issues about which we need not opine").

"This Court finds that plaintiffs have failed to prove that the catch basin and drainage pipe negatively affected plaintiffs' property *in any way* and, thus, [have] failed to prove that they have suffered *any harm* as a result. In fact, this Court finds it almost impossible to conceive of a way where plaintiffs could prove what [they] failed to prove." (Emphasis added.)

Although the trial justice issued his bench decision on November 30, 2016, final judgment did not enter until April 9, 2018. A timely notice of appeal was filed.

## II

## Standard of Review

When a trial justice sits without a jury, his factual findings "are accorded *great weight* and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." *Voccola v. Forte*, 139 A.3d 404, 412 (R.I. 2016) (emphasis in original) (internal quotation marks omitted); *see also D'Ellena v. Town of East Greenwich*, 21 A.3d 389, 391 (R.I. 2011); *see generally Cappuccilli v. Carcieri*, 174 A.3d 722, 731-32 (R.I. 2017). If, during the course of this Court's review of the record, "it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall *not* substitute our view of the evidence for [that of the trial justice] even though a contrary conclusion could have been reached." *Voccola*, 139 A.3d at 412-13 (emphasis in original) (internal quotation marks omitted); *see also Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I. 2009). We will accord "a substantial amount of deference to [the trial justice's credibility] determinations, due to the fact that [he or she] has actually observed the human drama that is part and parcel of every trial and * * * has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *Voccola*, 139 A.3d at 413 (alterations in original) (internal quotation marks omitted); *see also B.S. International Ltd. v. JMAM, LLC*, 13 A.3d 1057, 1062 (R.I. 2011).

13

**III**

**Analysis**

The plaintiffs contend that the trial justice erred in ruling in favor of defendants on both the nuisance and negligence claims on the basis of his finding that plaintiffs had failed to meet their burden of proving that the pipe on the Laverty property had caused plaintiffs harm. After an extensive review of the record, we conclude that there was nothing clearly erroneous about that determination.[9]

A private nuisance "arises from the unreasonable use of one's property that materially interferes with a *neighbor's* physical comfort or the *neighbor's* use of his real estate." *Hydro-Manufacturing, Inc. v. Kayser-Roth Corp.*, 640 A.2d 950, 957 (R.I. 1994) (emphasis in original) (internal quotation marks omitted); *see also DeNucci v. Pezza*, 114 R.I. 123, 128, 329 A.2d 807, 810 (1974) ("No one need suffer a neighbor's unreasonable use of his property."). We have held that "the essential element of an actionable nuisance is that *the plaintiffs have suffered harm or are threatened with injuries* that they ought not to have to bear." *Weida v. Ferry*, 493 A.2d 824, 826 (R.I. 1985) (emphasis added).

Similarly, in order for a plaintiff to prevail on a claim of negligence, that plaintiff "must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and * * * *actual loss or damage*." *Nationwide Property & Casualty Insurance Co. v. D.F. Pepper Construction, Inc.*, 59

---

[9] Because damages are an essential element of both negligence and nuisance and because we are upholding the trial justice's ruling in defendants' favor on the ground that plaintiffs failed to prove damages, we need not consider the other elements of the negligence or nuisance claims, including the existence and breach of a duty owed to plaintiffs under the negligence claim or the question of reasonable use as discussed by this Court in *Butler v. Bruno*, 115 R.I. 264, 341 A.2d 735 (1975), with respect to the nuisance claim.

14

A.3d 106, 110 (R.I. 2013) (emphasis added) (internal quotation marks omitted); *see Newstone Development, LLC v. East Pacific, LLC*, 140 A.3d 100, 104 (R.I. 2016).

The trial justice in this case heard and considered the testimony of plaintiffs' expert, Brandon Faneuf, a wetlands scientist, on the issue of damages allegedly caused to their land by the pipe. He similarly heard and considered the testimony of defendants' expert, Scott Rabideau, a professional wetlands scientist. He "was confronted with conflicting expert testimony and thus was free to choose one opinion over another." *Lowry v. Faraone*, 500 A.2d 950, 952 (R.I. 1985); *see also Cappuccilli*, 174 A.3d at 731. In the course of reaching his decision, the trial justice was unpersuaded by Mr. Faneuf's opinion that the pipe allowing water to flow from the Laverty property to the Silva property was causing the size of the preexisting wetland on the Silva property to increase. He noted that he so concluded because Mr. Faneuf "could not quantify how much wetter" the area on the Silva property was as a result of the pipe and because Mr. Faneuf "could not quantify how much the pipe increased the wetland."

The trial justice credited Scott Rabideau's opinion that the pipe was not causing the wetland to increase in lateral size. In making that determination, the trial justice expressly found as follows:

> "Mr. Rabideau's testimony was much more concrete and credible. He was able to definitively state that the wetland had not increased in size after the installation of the pipe based on an analysis of the aerial photos. His testimony was consistent with historical facts provided by the witnesses, especially Robert Tanguay, who had lived in the area since 1947."

Mr. Rabideau had testified that, based on his evaluation of the aerial photographs, the size of the wetland had remained unchanged from 1972 to 2011. He further noted that, because the pipe had been installed in 1987 and "[t]he lateral extent of the wetland did not change" from 1972 to 2011, the pipe was accordingly not causing an increase in the wetland's lateral size. Mr.

15

Rabideau's testimony was consistent with the testimony of longtime resident Robert Tanguay, who stated that there have been "wetlands" on the Silva property "[f]orever." Mr. Tanguay testified that there had been sufficient water on that portion of what was to become the Silva property before the installation of the pipe for the area at issue to be referred to as "Gerry's pond."

Our role is not to second-guess the trial justice who has heard and considered the testimony of various experts and fact witnesses on the issue of damages. *Voccola*, 139 A.3d at 412-13. In his decision, the trial justice found that plaintiffs had failed to meet their burden of proving that they had incurred damages, and he clearly articulated the basis for his failure-of-proof ruling; and that ruling fatally undermines both the negligence and nuisance claims. Our review of the record "indicates that competent evidence supports the trial justice's findings." *See id.* at 412 (internal quotation marks omitted). Taking into consideration the degree of deference which we afford a trial justice's determinations as we review the cold record of a nonjury trial, we are not persuaded that the trial justice in this case either overlooked or misconceived any material evidence. Because there was no clear error in the trial justice's conclusion that plaintiffs "failed to prove that they have suffered any harm," we perceive absolutely no basis for reversing his decision.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court, and we remand the record to that tribunal.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Maria Silva et al. v. Shawn Laverty et al. |
| **Case Number** | No. 2017-153-Appeal. <br> (PC 10-290) |
| **Date Opinion Filed** | March 22, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian Van Couyghen |
| **Attorney(s) on Appeal** | For Plaintiffs: <br><br> Michael F. Horan, Esq. <br> Monica Horan, Esq. |
| | For Defendants: <br><br> Ryan D. Fullerton, Esq. <br> Joseph A. DiMaio, Esq. |